# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------X
:
In re                                             :    Chapter 11
:
INSIGHTRA MEDICAL, INC., et al.[1]                :    Case No. 17-10179 (KG)
:
Debtors.                                          :    (Joint Administration Pending)
---------------------------------------------------------------X

## DECLARATION OF OLIVER POKK IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

Under 28 U.S.C. § 1746, I, Oliver Pokk, hereby declare as follows under the penalty of perjury:

1. From October 2014 until June 2016, I was the Senior Director of Global Marketing for Insightra Medical, Inc, ("Insightra"). Since June 2016, I have continued to work closely with Insightra as a consultant (among other roles), aiding the company through this transition and remaining heavily involved in the company's global sales and operations efforts. On December 16, 2016, I was appointed by Bradley Sharp to Insightra's board of directors. Accordingly, I am very familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records. I am also familiar with the Debtors' turnaround and restructuring efforts.

2. I have ten years of sales and operations experience in the medical device industry. Prior to joining Insightra, I was a Senior Manager of Global Marketing at Baxter Healthcare in Deerfield, Illinois from October 2012 through September 2014. Prior to that, I was the Senior Product Manager Veritas at Synovis Surgical Innovations

---

[1] The Debtors in these chapter 11 cases are Insightra Medical, Inc. and Modulare, Inc. The last four digits of Insightra's taxpayer identification number are (8576). Modulare does not have a taxpayer identification number. The Debtors' business address is 9891 Irvine Center Drive, Suite 222, Irvine, CA 92618.

in St. Paul, Minnesota from October 2011 through September 2012. Prior to that, I held other sales manager jobs at Lamed GmbH (VP of Sales and Marketing), Covidien, and Daimler in Germany from November 1998 through September 2011.

3. On the date hereof (the "Petition Date"), Insightra and Modular, Inc. ("Modular" and together with Insightra, the "Debtors") filed voluntary petitions with this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4. I submit this declaration (the "Declaration") in support of the Debtors' petitions and the "first day" motions and applications, described further below (collectively, the "First Day Motions"). I am familiar with the contents of each First Day Motion (including the attachments thereto), and, to the best of my knowledge, after reasonable inquiry, discussions with other employees, and through my review of the Debtors' books, records, and other information, I believe that the relief sought by the Debtors in the First Day Motions: (a) is necessary to enable the Debtors to continue to operate as debtors in possession during the course of their respective chapter 11 cases with minimal interruption, (b) is critical to the Debtors' efforts to preserve value and maximize recoveries, and (c) best serves the Debtors' estates and their creditors' interests. Further, I believe that the relief sought in the First Day Motions is narrowly tailored and necessary to achieve the goals of these chapter 11 cases.

5. Except as otherwise indicated, all statements in this Declaration are based upon (a) my personal knowledge, (b) my understanding of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees, management, or other professionals that I believe in good faith to be reliable,

or (c) my opinion based on my experience with the Debtors' operations and financial condition. If called upon to testify, I could and would competently testify to each of the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

### PART I: THE DEBTORS AND THEIR INNOVATIVE BUSINESS

**A.    The Debtors' Business**

6.     Insightra is a commercial-stage cardiology and general surgery medical devices company focused on marketing and manufacturing Intra Aortic Balloon Catheter kits and niche surgical products for, among other things, the inguinal and ventral hernia markets based on its proprietary designs. It was formed in 2001 and is headquartered in Irvine, California. The majority of Insightra's sales and marketing operations currently are based outside of the United States, with a large portion of operations based in India.

7.     Insightra is the parent corporation of Minos Medical, Inc. ("Minos"), a California corporation, Modulare, Inc. ("Modulare"), a Delaware corporation, Insightra Italia SRL ("Insightra Italia"), a company formed under the laws of Italy, and Insightra Medical India PVT Ltd. ("Insightra India"), a company formed under the laws of India. Minos, Insightra Italia and Insightra India are not Debtors in these chapter 11 cases. A complete corporate organization chart is attached hereto as Exhibit A.

8.     Insightra's core hernia products are Proflor and Octomesh. The Debtors' products are regulated by the Federal Drug Administration. Proflor is a novel polypropylene "biological spring" for inguinal hernia repair that, among other things, does not require sutures, reduces the procedure time and reduces opioid usage. Octomesh is a novel polypropylene ventral hernia repair system that, among other things, does not require sutures, lowers procedure failure risks and significantly reduces procedure time.

Both products are both 510(k) and CE Mark approved (the "FDA Approvals"). The FDA Approvals are an essential part of the Debtors' business and could be lost if this reorganization is unsuccessful. Moreover, any disruption to the FDA Approvals would severely impact the Debtors' ability to operate as a going concern.

9. Over the period of the twelve months ended on December 31, 2016, Insightra had consolidated sales of $3,554,000 and a consolidated net loss of $8,810,000. As of December 31, 2016, its assets had a net book value of $4,043,000 and it had total liabilities of $11,971,000. Historically, Insightra's main assets have been inventory, patents and the FDA Approvals relating to its products. However, Insightra currently has insufficient inventory to generate sales. This restructuring is required to fix the Debtors' balance sheet and allow for the infusion of new cash that will allow the Debtors to increase their inventory reserves and expand their sales platform.

10. Insightra and Modulare are managed by their respective boards of directors. Insightra currently has three directors: Mr. Brad Sharp, Mr. Laxmikant Khanolkar and me. Modulare currently has one director, Mr. Brad Sharp.

**B.    The Debtors' Capital Structure**

11. On November 4, 2015, Insightra issued to GPB Life Science Holdings, LLC ("GPB") that certain 13% Senior Secured Promissory Note in the principal amount of $5,000,000 (the "Promissory Note"). The Promissory Note is fully secured by all of Insightra's assets pursuant to that certain Security Agreement, dated November 4, 2015, by and among, Insightra, Minos and Modulare (the "Security Agreement"). The obligations are further guaranteed by Insightra India pursuant to that certain Guaranty Agreement, dated November 4, 2015 (the "Guaranty Agreement" and together with the

Promissory Note, Security Agreement and all related documents and amendments, the "Loan Documents").

12. Insightra has failed to pay the monthly interest due and owing to GPB since May 2016 and such failures constitute an Event of Default (the "Default") under the Loan Documents. Subsequent to the initial Default, the Debtors negotiated two forbearance agreements with GPB, dated October 4, 2016 and December 22, 2016, respectively, pursuant to which GPB agreed to refrain from exercising its remedies under the Loan Documents and to lend an additional $225,000 to the Debtors for continued operating expenses. The Debtors have been and continue to be unable to cure the Default, and the aggregate amount due under the Loan Documents, including the default penalty, unpaid accrued interest and expenses as of the Petition Date, is no less than approximately $6,845,268.

13. In addition to its obligations under the Loan Documents, Insightra is a party to an unsecured bridge loan, entered into in April 2016, with various equity holders pursuant to which Insightra issued those holders unsecured promissory notes in the aggregate principal amount of $1.5 million (the "Bridge Loan"). The Debtors also have unsecured trade debt in the approximate amount of $2.8 million owed to approximately 75-100 trade vendors. Finally, as of the Petition Date, Insightra had outstanding: (i) 5,683,443 shares of Series A Preferred Stock, (ii) 10,000,000 shares of Series B Preferred Stock, (iii) 44,885,424 shares of Series C Preferred Stock, (iv) 33,352,593 shares of Series C-2 Preferred Stock, (v) 18,264,271 shares of common stock, and (vi) various warrants to purchase common stock and certain preferred stock. GPB also holds a

warrant to purchase 3,750,000 shares of common stock exercisable at $0.22 per share. These warrants have not been exercised and have no value.

**C.    The Debtors' Prepetition Litigation**

14.    One of the main disputes—if not *the* main dispute—in these cases will be the liquidation of the contingent and unliquidated claim of Giuseppe Amato ("Amato"). Amato's claim arises from a complaint he filed in the Superior Court for the State of California, County of Los Angeles (Case No. BC495837) on November 20, 2012, against Insightra and certain other defendants (the "Amato Litigation").  Amato alleges claims against Insightra for fraud, mistake, unfair business practices and declaratory relief, arising primarily from Amato's allegation that the defendants improperly induced him to enter into unfair license and consulting agreements with Insightra.[2]  He seeks, among other relief, damages in excess of $15,000,000.  In response to the complaint, Insightra filed a cross-complaint against Amato, alleging claims for intentional misrepresentation, intentional suppression of fact, negligent misrepresentation and fraud.  Discovery in this action is closed and the case is currently set for a twenty-day jury trial to commence March 20, 2017.  The Debtors continue to defend the Amato Litigation and do not expect that they will have any liability to Amato above and beyond the $16,000 they believe is owed on an unsecured basis.

**PART II: KEY EVENTS LEADING TO
COMMENCEMENT OF THESE CHAPTER 11 CASES**

15.    Beginning in 2013, management focused its efforts on raising capital to commercialize Insightra's core hernia products in the U.S. to better position the company for growth in the marketplace.  Insightra raised the first tranche of its Series C Preferred

---

[2] Amato's complaint originally included a breach of fiduciary duty count against Insightra, but it was later dismissed by order of the court.

Stock, in the amount of $13,000,000, with the express purpose of commercializing its core hernia assets in the U.S. This initial tranche of Series C Preferred, however, provided insufficient funds for the company to hire a direct U.S.-based sales force, which is critical to the ultimate success of its products in the U.S. As a result, Insightra sought and received a second tranche of the Series C Preferred Stock in the amount of $6,000,000.

16. Around the closing of the second tranche, Insightra was approached by Baxter Healthcare Corporation ("Baxter") to distribute Baxter's Veritas line; a biologic mesh for hernia repair. The opportunity was projected to be a $10,000,000 business, providing Insightra with a 50% commission and going a long way to plug the liquidity hole the company was facing. Indeed, Insightra's management viewed the Veritas deal as a way to offset the very significant cost of building a U.S.-based sales force and to accelerate the adoption of its core products. In August 2014, however, Baxter changed course and indicated that the base business would only be a 30% commission, representing a reduction of 20% from the original understanding. Baxter attempted to ameliorate the reduced commissions by indicating its willingness to sell the global Veritas to Insightra before the end of 2014. With that understanding, in October of 2014, the Veritas deal was signed, calling for minimum sales of $7,500,000.

17. At the end of 2014, the Veritas business finished with approximately $7,100,000 in sales. However, Insightra lost $1,200,000 of contracts during the year, which translated to a 2015 opening run rate of $5,800,000. By the end of the first quarter of 2015, Insightra had hired an additional 34 employees to support the Veritas business. Shortly thereafter, Baxter announced it was no longer interested in selling Veritas. This

led to negotiations between the parties over what Insightra viewed as necessary amendments to the distribution agreement in light of Baxter's decision not to sell the Veritas line.

18. In parallel, Insightra's management pursued $12-15 million of new long term debt. However, given the company's cash balance and the unavailability of insiders to co-invest, the facility was difficult to obtain and, in March 2015, Insightra retained a broker to assist in the process.

19. In April 2015, Baxter once again professed interest in selling the Veritas line, but ultimately changed its mind for a second time in July 2015. During the course of negotiations, Insightra suspended payments to Baxter pending Baxter's agreement to either sell the Veritas line or revise the distribution agreement. Baxter never agreed to sell the Veritas line and subsequently terminated the distribution agreement, thereby leaving Insightra in a severe liquidity crisis.

20. Following the termination of the Baxter agreement, the Debtors' management determined that Insightra either had to sell its assets or pursue two identified strategic acquisitions. Insightra's board of directors authorized the pursuit of the acquisitions in parallel to closing on a secured debt facility. Also, to aid in the liquidity crisis, certain of Insightra's equity holders agreed to provide the company with the $1,500,000 Bridge Loan.

21. In May 2015, Insightra entered into a non-binding term sheet for a new $16,000,000 secured debt facility. However, closing never occurred and, in August 2015, Insightra again ran out of cash. At this point, Insightra's broker introduced the company

to GPB. By October 2015, the Company raised additional equity capital from insiders supplemented by the Promissory Note from GPB in the principal amount of $5,000,000.

22. With respect to the target acquisitions, Insighta engaged Wedbush Securities ("Wedbush") to assist with the capital raising necessary to pursue to the transactions. From October 2015 through May 2016, Insightra, with the assistance of Wedbush, focused exclusively on raising capital. Notwithstanding these efforts, the Debtors were unable to secure the funds they needed to pursue the transactions. To make matters worse, the Debtors' insiders and equity holders were not in a position to further bridge the company. As a result, at a May 2016 meeting, the Debtors' board of directors were forced to make the difficult decision to eliminate all of their employees and staff. Since that time, the Debtors have had minimal operations, run exclusively by various individuals pursuant to consulting agreements.

23. On May 26, 2016, four of the five members of Insighta's board of directors resigned. These former directors are Michael Liang, Shane Johnson, Rajesh Moorti and Dan Omstead.

24. On October 27, 2016, pursuant to Insightra's articles of incorporation, Chris Jarrous and Gayle Arnold, Insightra's Chief Financial Officer, were appointed to Insightra's board of directors. On November 14, 2016, the Debtors' directors' and officers' insurance policy purportedly expired, as the provider advised management it was unwilling to renew given the company's dire position. The Debtors at that time purchased a tail for the expired policy but, notwithstanding significant efforts, were unable to secure a cost-efficient replacement policy. As a result, on December 15, 2016, Mr. Jarrous and Ms. Arnold resigned from the board of directors.

25. On December 16, 2016, Laxmikant Khanolkar and I were appointed to the board of directors. Both Mr. Khanolkar and I are former employees of Insightra and currently work as consultants for the company. Because the company was unable to obtain cost efficient insurance, Messrs. Khanolkar, Sharp and I requested, and GPB agreed to provide, indemnification rights to each of us in an amount capped at $200,000 for actions taken from December 19, 2016 through the dismissal or the date that the Bankruptcy Court closes these chapter 11 cases.

26. Given these and other considerations, the Debtors' board concluded in December 2016 that the best and only viable path to maximize the value of the Debtors' business is a strategic prepackaged chapter 11 filing. On December 20, 2016, after negotiations with GPB on the terms of a chapter 11 plan and attendant financing facility, the Debtors' board of directors approved for solicitation that certain *Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Prepackaged Plan") and accompanying disclosure statement (the "Disclosure Statement"), which are being filed contemporaneously herewith.

27. The Prepackaged Plan operates as a complete restructuring of the Debtors' prepetition balance sheet and, if confirmed by this Court, will provide for a distribution to unsecured creditors and ultimately allow the Debtors to exit from bankruptcy as a viable go-forward business. Under the Prepackaged Plan, in exchange for the full and final satisfaction of no less than $4,800,000 of GPB's Promissory Note and the DIP Facility (as defined herein), GPB shall receive 100% of the common stock issued in the reorganized Debtors, $1,000,000 of $100 par value new preferred stock, and a new secured note in an amount up to $2,850,000 (the "New Secured Note). The amount of

the New Secured Note may be increased on or after the effective date of the Prepackaged Plan for new money loaned to the reorganized Debtors based on their cash needs. To be clear, GPB has committed to provide the reorganized Debtors with funding to cover any operational shortfalls for a period of no less than two years following exit from these cases. Significantly, if the Prepackaged Plan is confirmed, the Debtors' unsecured creditors will receive 7.5% of their allowed claims (in addition to other consideration). I believe that confirmation of the Prepackaged Plan is the only source available for a distribution to unsecured creditors given the Debtors' current financial position.

28. The Debtors commenced solicitation of the Prepackaged Plan on December 21, 2016, with an initial voting deadline of January 11, 2017. The voting deadline was subsequently extended, on notice to all parties entitled to vote,[3] to January 25, 2017.

29. Two classes of creditors were entitled to vote on the Prepackaged Plan, specifically class 3 secured claims held by GPB and class 4 general unsecured creditors. GPB, as the sole holder of class 3 claims voted to accept the Prepackaged Plan. In regards to class 4 general unsecured votes, 24 ballots were received prior to the extended voting deadline, purporting to represent on their face approximately $31,554,847.45 in unsecured claims.[4] 23 of the 24 ballots received voted in favor of the Prepackaged Plan, representing 95.83% in number and 49.29% in amount. The lone rejecting ballot was submitted by Amato in the amount of $16,000,000.

---

[3] The solicitation materials and subsequent extended notice of voting deadline were served on holders of claims entitled to vote via certified mail, return receipt requested.

[4] The figures in this sentence do not include one ballot in favor of the plan that was determined to be deficient pursuant to the solicitation procedures outlined in the Prepackaged Plan and an additional 17 convenience class "opt-in" ballots.

30. The Debtors dispute Amato's entitlement to vote an unliquidated and contingent claim on account of the unresolved Amato Litigation. If Amato's ballot is counted in the appropriate amount of Amato's claim ($16,000), *class 4 will have voted to accept the plan at a 99.9% rate*. In the coming weeks, the Debtors intend to seek the Court's estimation of the appropriate amount for Amato's ballot. The Debtors are fully aware of the risks of an adverse ruling on the Amato ballot, but have nonetheless determined in their business judgment that commencement of these cases and prosecution of the Prepackaged Plan is in the best interests of all stakeholders, as the only available path to reorganization and to avoid an immediate piecemeal liquidation. Indeed, given the Debtors' balance sheet, the Prepackaged Plan represents the only means for unsecured creditors to receive anything on account of their claims and the sole prospect for unsecured creditors to have a go-forward trade partner.

## PART III: THESE CHAPTER 11 CASES AND THE FIRST DAY PLEADINGS

31. The Debtors have commenced these chapter 11 cases to restructure and reorganize their business. In connection with their petitions, the Debtors have filed a minimal set of motions seeking relief designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through these chapter 11 cases, and minimize any disruptions to the Debtors' operations.

32. Concurrently with their chapter 11 petitions, the Debtors are filing the following "First Day Motions" seeking orders granting various forms of relief. I have reviewed each of the First Day Motions, and I believe, among other things, the relief requested in the First Day Motions is necessary to enable the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases and approval of the relief

sought therein will be critical to the Debtors' efforts to restructure and reorganize their business in a manner that preserves and maximizes value for the benefit of all stakeholders.

### A. Joint Administration Motion

33. The Debtors request entry of an order directing joint administration of their chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). More specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the case of parent company Insightra Medical, Inc. Further, the Debtors request that an entry be made on the docket of Modulare indicating the joint administration of these cases under the Insightra docket.

34. Given the integrated nature of the Debtors' operations, joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will be filed in these cases will almost certainly affect each of the Debtors. Accordingly, an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency. I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to manage these chapter 11 cases with minimal disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

B. **Cash Management Motion.**

35. Pursuant to the Cash Management Motion, the Debtors request the entry of interim and final orders authorizing (i) the maintenance and continued use of the Debtors' existing cash management system and bank account, including the authority to pay routine prepetition banking fees owed to financial institutions, (ii) the limited continued use of existing checks and business forms, and (iii) the continued monthly support payments to Insightra India, as needed, up to $12,000 per month.

36. As of the Petition Date, the Debtors maintain a single bank account (the "Account") and primarily operate their cash management system (the "Cash Management System") through the Account at Comerica, Inc. The Debtors incur certain fees and charges in connection with the ordinary course of operations (collectively, the "Bank Fees"). Pursuant to this Motion, the Debtors request authority to continue use their Cash Management System in place as of the Petition Date and to honor and pay applicable Bank Fees in the ordinary course of business, including Bank Fees prior to the Petition Date. Authorizing the Debtors to maintain their existing Bank Account and Cash Management System will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more critical matters during the initial days of these chapter 11 cases.

37. The Debtors also utilize numerous preprinted business forms in the ordinary course of their business (including, without limitation, letterhead, purchase orders, invoices and checks) (collectively, the "Business Forms"). In connection with their chapter 11 cases, I understand that the Debtors would be required to incur the expense and delay of ordering entirely new business forms referencing the Debtors' status as debtors in possession absent relief from the Court. Pursuant to the Cash

Management Motion, the Debtors request that they be authorized to use their pre-existing Business Forms without such a reference in order to minimize expense to the estates. To the extent the Debtors exhaust their existing supply of checks, each Debtor entity will reorder checks with the designation "Debtor-in-Possession" and the corresponding case number.

38.     Finally, as indicated herein, the Debtors do not have any meaningful amount of sales in the United States. Instead, the Debtors currently operate through a non-debtor subsidiary, Insightra India. Insightra India employs as consultants five sales persons that are responsible for educating the market about Insightra's products. The Indian sales force is currently the Debtors' sole sales force. Insightra India has its own bank account in India and collects payments for customers supplied through this legal entity. On a monthly basis, Insightra provides financial support to Insightra India in the amount of roughly $12,000. This money is necessary to support the continued operations of Insightra India, including payment of the Indian sales force. Post-effective date of the proposed Prepackaged Plan, the Debtors will spend significant sums to ramp up the inventory level of Insightra India and its sales force. In the interim, I believe that the continued funding and support of Insightra India is critical to the Debtors' business and that $12,000 per month is a small sum to pay to ensure the continued going concern value of the Debtors. If these payments are not made, the Debtors will not have a sales force and there would be no need to reorganize.

39.     For these reasons, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business

in chapter 11 with minimal disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

### C. "NOL" Motion

40. Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders establishing notification procedures and approving restrictions on certain transfers of interest in the Debtors.

41. The Debtors have certain favorable attributes for U.S. federal income tax purposes (the "Tax Attributes"), which include, as of the Petition Date, roughly $35-40 million in estimated, consolidated net operating loss carryforwards ("NOLs").  The Tax Attributes are valuable assets of these estates, as I understand title 26 of the United States Code (the "Tax Code") generally permits corporations to carry forward their NOLs to reduce future taxable income.  *See* Tax Code § 172.  The Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of a chapter 11 plan, and potentially thereafter.  Accordingly, absent any intervening limitations and depending upon the Debtors' future operating results, the Tax Attributes could translate into future tax savings over time and any such savings could enhance the Debtors' cash position for the benefit of all parties in interest and contribute to the Debtor's efforts toward a successful reorganization.

42. The Debtors' ability to use the NOLs to reduce future tax liability is subject to certain statutory limitations.  I understand that sections 382 and 383 of the Tax Code limit a corporation's use of its tax attributes to offset future income after that corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code ("Section 382" and such ownership change, an "Ownership Change").  Pursuant to Section 382, I understand that an Ownership Change generally occurs when

the percentage of a corporation's equity held by its "5-percent shareholders" (within the meaning of Section 382) increases by more than 50 percentage points above the lowest percentage of ownership owned by such shareholder(s) at any time during the relevant testing period (usually three years).  In addition, an Ownership Change can occur where a "50-percent shareholder" (within the meaning of section 382(g)(4)(D) of the Tax Code) claims a worthlessness deduction in respect of its direct or indirect ownership of the corporation.

43. The Debtors do not believe that an Ownership Change has occurred with respect to the Tax Attributes prior to the Petition Date and, accordingly, believe that they continue to have significant Tax Attributes that would be adversely affected (and could be effectively eliminated) by an Ownership Change during the pendency of these cases. It is, therefore, in the best interests of the Debtors and their stakeholders to restrict trading that could result in an Ownership Change before the effective date of a chapter 11 plan or applicable bankruptcy court order.  This would protect the Debtors' ability to use the Tax Attributes during the pendency of these chapter 11 cases or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtors' sale or ownership of their assets, which may be significant in amount.

44. For the reasons, the Debtors seek entry of interim and final orders establishing procedures designed to ensure the preservation of the Tax Attributes.  I believe that the relief requested in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to preserve a valuable asset of these estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the NOL Motion should be approved.

**D. Debtor In Possession Financing ("DIP Motion")**

45.     Subject to Court approval, the Debtors have negotiated and reached an agreement to enter into a debtor-in-possession credit facility with GPB for an aggregate amount of up to $750,000 (the "DIP Facility").  Pursuant to the DIP Motion, the Debtors seek entry of an interim order authorizing the Debtors to borrow an initial amount of $125,000 to fund the Debtors' operations pending entry of a final order.

46.     The DIP Facility is being offered by GPB in connection with the Prepackaged Plan, which as described herein contemplates the reorganization and survival of the Debtors as a post-emergence entity.  As further described in the Disclosure Statement, the Debtors have searched for strategic alternatives in various forms for several years.  The Debtors believe that, with the assistance of their advisors (current and former), they exhausted the search for value maximizing transactions and that the Prepackaged Plan represents the only available path forward that doesn't culminate in a wholesale liquidation of the Debtors' business.

47.     The DIP Facility will provide the Debtors sufficient liquidity to finance their operations until emergence from chapter 11.  The Debtors are also seeking authorization to use cash collateral on an interim basis, which, together with the DIP Facility, will be used by the Debtors to support their working capital requirements and other general corporate purposes as well as to satisfy the costs attendant to these chapter 11 cases.  Without these expenditures, the Debtors will be forced to cease operations, which would result in irreparable harm to their business and an inability to preserve and maximize the value of their assets and operations.

48.     In my opinion, the terms and conditions of the DIP Facility and the use of cash collateral are fair and reasonable and were negotiated by the parties in good faith

and at arm's length after the Debtors and their advisors concluded a good faith effort to market the company for sale over a period of several years.  Given the unsuccessful prepetition search for alternatives and the Debtors' dire financial position, I do not believe that the Debtors can obtain financing to fund and preserve their assets on terms more favorable than those offered by GPB under the DIP Facility and that the Debtors are (and have been) unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  I also do not believe that the Debtors are likely to obtain secured credit under section 364(c) of the Bankruptcy Code on equal or more favorable terms than those offered by GPB under the DIP Facility.

49. The Debtors have determined, in their reasonable business judgment, that the DIP Facility is the best financing option available under the present circumstances and will enable the Debtors to operate their business in chapter 11 with minimal disruption while they prosecute the Prepackaged Plan.

50. I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed on January 27, 2017.

                                                  */s/ Oliver Pokk*
                                                  Oliver Pokk
                                                  Authorized Representative for the Debtors