# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------X
:
In re                                            :          Chapter 11
                                                 :
INSIGHTRA MEDICAL, INC. and                      :          Case No. 17-_____
MODULARE, INC.                                   :
                          Debtors.               :          (Joint Administration Pending)
                                                 :
----------------------------------------------------------------X

## DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

BAYARD, P.A.
Justin R. Alberto (No. 5126)
GianClaudio Finizio (No. 4253)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: jalberto@bayardlaw.com
        gfinizio@bayardlaw.com

*Proposed Counsel for the Debtors and Debtors in Possession*

Dated:  December 20, 2016

**THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN (AS DEFINED HEREIN) BEFORE THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").  BECAUSE THE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.  FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT (I) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (II) APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE, AND (III) CONFIRMING THE PLAN PURSUANT TO SECTION 1129 OF THE BANKRUPTCY CODE.**

## DISCLOSURE STATEMENT, DATED DECEMBER 20, 2016

### Solicitation of Votes on the

### Joint Plan of Reorganization of

### INSIGHTRA MEDICAL, INC. and

### MODULARE, INC.

### from the Holders of outstanding

### CLASS 3: GPB SECURED CLAIMS; and

### CLASS 4: GENERAL UNSECURED CLAIMS

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON JANUARY 11, 2017 (THE "SOLICITATION PERIOD"), UNLESS EXTENDED BY THE DEBTORS.  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTEREST MAY VOTE ON THE PLAN IS DECEMBER 20, 2016 (THE "RECORD DATE").**

---

### RECOMMENDATION BY THE DEBTORS

The Board of Directors of Insightra Medical, Inc. ("*Insightra Medical*" or the "*Company*") (as of the date hereof) has unanimously approved the transactions contemplated by the Solicitation and the Plan and recommend that all creditors whose votes are being solicited submit ballots to **accept** the Plan.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISERS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN. CAPITALIZED TERMS NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

THE ISSUANCE OF AND THE DISTRIBUTION UNDER THE PLAN OF THE NEW STOCK SHALL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE, OR, IF APPLICABLE, SECTION 4(A)(2) OF THE SECURITIES ACT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE NEW STOCK TO BE ISSUED ON THE EFFECTIVE DATE HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SOLICITATION OF VOTES ON THE PLAN IS BEING MADE PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT TO GPB LIFE SCIENCE WHO IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A OF THE SECURITIES ACT), "INSTITUTIONAL ACCREDITED INVESTORS" (WITHIN THE MEANING OF RULE 501(A) OF REGULATION D OF THE SECURITIES ACT) OR NON-"U.S. PERSONS" (AS DEFINED IN REGULATION S OF THE SECURITIES ACT).

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN

THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

DURING THE CHAPTER 11 CASES, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS CONTAINED HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1
II.   OVERVIEW OF DEBTORS' OPERATIONS ................................................. 5
      A.   Debtors' Business. ................................................................................. 5
      B.   Directors and Officers. .......................................................................... 5
      C.   Regulation of Debtors' Business. .......................................................... 6
      D.   Debtors' Capital Structure. .................................................................... 6
III.  KEY EVENTS LEADING TO COMMENCEMENT OF THE
      CHAPTER 11 CASE ........................................................................................ 7
IV.   ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE ................. 9
      A.   Commencement of Chapter 11 Cases and First Day Motions ............... 9
           1.   Debtor In Possession Financing ............................................ 10
           2.   Cash Management System ..................................................... 10
           3.   Bank Accounts. ..................................................................... 10
      B.   Other Procedural Motions and Retention of Professionals. ............... 11
      C.   Confirmation Hearing. ......................................................................... 11
      D.   Timetable for Chapter 11 Cases .......................................................... 11
V.    PENDING LITIGATION ............................................................................... 11
VI.   SUMMARY OF PLAN ................................................................................... 12
      A.   Administrative, DIP Facility and Priority Claims. ............................. 12
           1.   Treatment of Administrative Claims. .................................... 12
           2.   Treatment of DIP Facility Claims. ....................................... 13
           3.   Treatment of Priority Tax Claims. ........................................ 13
      B.   Classification of Claims and Interests. ............................................... 13
           1.   Classification in General. ...................................................... 13
           2.   Summary of Classification of Claims and Interests. ............. 13
      C.   Treatments of Claims and Interests. .................................................... 14
           1.   Other Priority Claims – Class 1. ........................................... 14
           2.   Other Secured Claims – Class 2. ........................................... 14
           3.   GPB Secured Claim – Class 3. .............................................. 15
           4.   General Unsecured Claims – Class 4. .................................... 15
           5.   Convenience Class Claims – Class 5. .................................... 15
           6.   Subordinated Claims – Class 6. ............................................. 16
           7.   Equity Interests in Insightra Medical, Inc. – Class 7. ........... 16
      D.   Means for Implementation. .................................................................. 16
           1.   Corporate Existence. ............................................................. 16
           2.   Substantive Consolidation ..................................................... 16
           3.   Vesting of Assets in the Reorganized Debtors ...................... 16
           4.   Cancellation of Agreements, Notes and Equity Interests ...... 17

| | | | |
|---|---|---|---|
| | 5. | Reorganized Company Equity Interests | 17 |
| | 6. | Restructuring Transactions | 17 |
| | 7. | Corporate Action | 17 |
| | 8. | Post-Effective Date Governance | 18 |
| | 9. | Effectuating Documents and Further Transactions | 18 |
| | 10. | Authority to Act | 18 |
| | 11. | Exemption from Certain Transfer Taxes and Recording Fees | 19 |
| | 12. | Board Representation | 19 |
| | 13. | Senior Management | 19 |
| | 14. | Preservation of Rights of Action | 19 |
| | 15. | Nonconsensual Confirmation. | 20 |
| | 16. | Closing of Chapter 11 Cases. | 21 |
| | 17. | Notice of Effective Date. | 21 |
| E. | | Distributions. | 21 |
| | 1. | Distributions on Account of Claims and Equity Interests Allowed As of the Effective Date | 21 |
| | 2. | Distributions on Account of Claims and Equity Interests Allowed After the Effective Date | 21 |
| | 3. | Delivery of Distributions | 22 |
| | 4. | No Postpetition Interest | 23 |
| | 5. | Claims Paid or Payable by Third Parties | 23 |
| | 6. | Allocation Between Principal and Accrued Interest | 23 |
| | 7. | Minimum Distribution | 24 |
| | 8. | General Unsecured Claims Distribution Account | 24 |
| F. | | Procedures for Resolving Claims. | 24 |
| | 1. | Allowance of Claims and Equity Interests | 24 |
| | 2. | Claims and Equity Interests Administration Responsibilities | 24 |
| | 3. | Estimation of Claims and Equity Interests | 25 |
| | 4. | Disallowance of Claims or Equity Interests | 25 |
| | 5. | Preservation of Debtor's Rights and Defenses Pending Allowance of Claims | 25 |
| G. | | Executory Contracts and Unexpired Leases. | 26 |
| | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 26 |
| | 2. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 26 |
| | 3. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 27 |
| | 4. | Assumption of Directors and Officers Insurance Policies | 27 |
| | 5. | Reservation of Rights | 27 |

|  |  | 6. | Nonoccurrence of Effective Date | 27 |
|  |  | 7. | Compensation and Benefits Programs | 28 |
|  | H. | Conditions Precedent to Confirmation of Plan and Effective Date. | | 28 |
|  |  | 1. | Conditions Precedent to Confirmation. | 28 |
|  |  | 2. | Conditions Precedent to the Effective Date | 28 |
|  |  | 3. | Waiver of Conditions Precedent. | 29 |
|  |  | 4. | Non-Occurrence of Conditions. | 29 |
|  | I. | Release, Injunctive and Related Provisions. | | 29 |
|  |  | 1. | Binding Effect; Plan Binds All Holders of Claims and Equity Interests. | 29 |
|  |  | 2. | Discharge of Claims and Termination of Equity Interests | 30 |
|  |  | 3. | Subordination | 30 |
|  |  | 4. | Compromise and Settlement of Claims, Equity Interests, and Controversies | 31 |
|  |  | 5. | Debtor Release | 31 |
|  |  | 6. | Releases by Holders of Claims | 32 |
|  |  | 7. | Exculpation | 33 |
|  |  | 8. | Injunction | 33 |
|  |  | 9. | Setoffs | 34 |
|  |  | 10. | Release of Liens | 34 |
|  |  | 11. | Solicitation of Plan. | 34 |
|  |  | 12. | Corporate Action. | 35 |
|  | J. | Retention of Jurisdiction. | | 35 |
|  |  | 1. | Immediate Binding Effect | 35 |
|  |  | 2. | Payment of Statutory Fees | 36 |
|  |  | 3. | Modification of Plan | 36 |
|  |  | 4. | Revocation of Plan | 36 |
|  |  | 5. | Reservation of Rights | 37 |
|  |  | 6. | Successors and Assigns | 37 |
|  |  | 7. | Service of Documents | 37 |
|  |  | 8. | Term of Injunctions or Stays | 38 |
|  |  | 9. | Entire Agreement | 38 |
|  |  | 10. | Governing Law | 38 |
|  |  | 11. | Exhibits | 38 |
|  |  | 12. | Nonseverability of Plan Provisions upon Confirmation | 38 |
|  |  | 13. | Closing of Chapter 11 Cases | 39 |
|  |  | 14. | Conflicts | 39 |
|  |  | 15. | Section 1125(e) Good Faith Compliance | 39 |
| VII. | | FINANCIAL INFORMATION AND PROJECTIONS | | 39 |
|  | A. | Consolidated Condensed Projected Financial Information. | | 39 |

| | | |
|---|---|---|
| VIII. | VALUATION ANALYSIS | 42 |
| IX. | TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS | 43 |
| X. | CERTAIN TAX CONSEQUENCES OF PLAN | 44 |
| | A. Consequences to the Debtors | 46 |
| | B. Consequences to GPB Life Science | 46 |
| | C. Consequences to Holders of General Unsecured Claims and Convenience Class Claims | 47 |
| | D. Gain or Loss | 47 |
| | E. Distributions in Satisfaction of Accrued but Unpaid Interest | 48 |
| | F. Information Reporting and Backup Withholding | 48 |
| | G. Consequences to Holders of Subordinated Claims | 49 |
| | H. Consequences to Holders of Class 7 Equity Interests | 49 |
| | I. Accrued Interest | 49 |
| XI. | CERTAIN RISK FACTORS TO BE CONSIDERED | 50 |
| | A. Certain Bankruptcy Law Considerations. | 50 |
| | 1. General | 50 |
| | 2. Risk of Non-Confirmation of Plan. | 50 |
| | 3. Non-Consensual Confirmation. | 51 |
| | 4. Risk of Non-Occurrence of Effective Date. | 51 |
| | 5. Conversion into Chapter 7 Cases. | 51 |
| | B. Additional Factors Affecting the Value of Reorganized Debtors. | 51 |
| | 1. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary. | 51 |
| | C. Risks Relating to the Debtors' Business and Financial Condition. | 52 |
| | D. Factors Relating to Securities to Be Issued Under the Plan, Generally. | 52 |
| | 1. No Current Public Market for Securities. | 52 |
| | 2. Potential Dilution. | 52 |
| | E. Risks Related to Outstanding Debt Obligations | 53 |
| | 1. Insufficient Cash Flow to Meet Debt Obligations. | 53 |
| | F. Risks Related to an Investment in New Stock. | 54 |
| | 1. Equity Interests Subordinated to Reorganized Debtors' Indebtedness. | 54 |
| | 2. Implied Valuation of New Stock Not Intended to Represent Trading Value of New Stock. | 54 |
| | G. Additional Factors | 54 |
| | 1. Debtors Could Withdraw Plan. | 54 |
| | 2. Debtors Have No Duty to Update. | 54 |
| | 3. No Representations Outside this Disclosure Statement Are Authorized. | 55 |

|  | 4. | No Legal or Tax Advice Is Provided by this Disclosure Statement. | 55 |
|  | 5. | No Admission Made. | 55 |
|  | 6. | Certain Tax Consequences. | 55 |
| XII. | | VOTING PROCEDURES AND REQUIREMENTS | 55 |
|  | A. | Voting Instructions and Voting Deadline. | 55 |
|  | B. | Parties Entitled to Vote. | 57 |
|  | C. | Agreements Upon Furnishing Ballots. | 57 |
|  | D. | Change of Vote. | 58 |
|  | E. | Waivers of Defects, Irregularities, etc. | 58 |
|  | F. | Miscellaneous. | 58 |
| XIII. | | CONFIRMATION OF PLAN | 59 |
|  | A. | Confirmation Hearing. | 59 |
|  | B. | Objections to Confirmation. | 59 |
|  | C. | Requirements for Confirmation of Plan. | 61 |
|  | 1. | Requirements of Section 1129(a) of the Bankruptcy Code. | 61 |
|  | 2. | Additional Requirements for Non-Consensual Confirmation. | 64 |
| XIV. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 65 |
|  | A. | Alternative Plan of Reorganization. | 66 |
|  | B. | Sale Under Section 363 of the Bankruptcy Code. | 66 |
|  | C. | Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law. | 66 |
| XV. | | CONCLUSION AND RECOMMENDATION | 67 |

EXHIBIT A: Prepackaged Plan

EXHIBIT B:  Projections

# I.

## INTRODUCTION

The Debtors submit this Disclosure Statement in connection with the solicitation of votes on the *Debtor's Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated December 20, 2016 to be filed in the Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") after the Solicitation Period.

After extensive discussions over the past several months with their largest secured lender, GPB Life Science Holdings, LLC (together with its affiliates, "***GPB***"), the Debtors reached an agreement with GPB Life Science on the Plan that will right-size the Debtors' balance sheets and set the Debtors on a path to emerge from the Chapter 11 Cases as a leaner and healthier business.

The Plan provides for a reorganization of the Debtors' business.  Under the Plan, GPB's secured claim (the "***GPB Secured Claim***") shall be allowed in the aggregate amount of no less than $6,292,113 as of the Petition Date.  In exchange for full and final satisfaction, settlement, release and discharge of no less than $4,800,000 of the GPB Secured Claim and its DIP Facility Claim, on the Effective Date, GPB shall receive one hundred percent (100%) of the common stock issued in Reorganized Insightra Medical, Inc. (the "***New Common Stock***"), $1,000,000 of $100 par value new preferred stock issued in Reorganized Insightra Medical, Inc. (the "***New Preferred Stock***" and collectively with the New Common Stock, the "***New Stock***") and will also be issued the New Secured Note in the amount of up to $2,850,000 (the "***New Secured Note***").  The New Secured Note will toggle between cash pay interest and payment in kind depending on the Reorganized Debtors' cash flows.  The amount of the New Secured Note may be increased on or after the Effective Date for new money loaned to the Company by GPB based upon the Company's cash needs.  On the Effective Date, GPB shall provide the Company with a commitment to fund the Company's shortfalls for the following two year period.

**WHO IS ENTITLED TO VOTE:** Under the Bankruptcy Code, only Holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such Holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the Holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing

defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

There are two Classes of Claims entitled to vote on the Plan whose acceptances of the Plan are being solicited: (i) the GPB Secured Claim; and (ii) General Unsecured Claims.

THE PLAN PROVIDES THAT HOLDERS OF IMPAIRED CLAIMS WHO DO NOT SUBMIT A BALLOT TO ACCEPT OR REJECT THE PLAN OR WHO REJECT THE PLAN BUT DO NOT OPT OUT OF THE RELEASE PROVISIONS OF THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.

The following table summarizes (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for Holders of Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Section VI—Summary of the Plan below. A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Valuation Analysis, as defined in Section VIII.

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on the later of the Effective Date or the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter; provided, however, that, subject to Bankruptcy Court approval, priority wage claims may be paid in full in the ordinary course of business. | Unimpaired | No (Deemed to Accept) | 100% |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the Debtors, shall (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim, plus post-petition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive other | Unimpaired | No (Deemed to Accept) | 100% |

| | | | | | |
|---|---|---|---|---|---|
| | | treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter. | | | |
| 3 | GPB Secured Claim | In exchange for full and final satisfaction, settlement, release and discharge of no less than $4,800,000 of the GPB Secured Claim, on the Effective Date, GPB shall receive one hundred percent (100%) of the New Common Stock, $1,000,000 of $100 par value New Preferred Stock,  and the New Secured Note, each subject to dilution based upon satisfaction of the DIP Facility Claim. | Impaired | Yes | 67% |
| 4 | General Unsecured Claims | If Class 4 votes to Accept the Plan, each Holder of an Allowed General Unsecured Claim shall receive in exchange for full and final satisfaction, settlement, release and discharge of each General Unsecured Claim, on or as soon as reasonably practicable afer the Effective Date, seven and one-half percent (7.5%) of the Allowed General Unsecured Claim paid in Cash, provided however, that distributions on account of such Claims shall be made only to the extent such Claims were not previously satisfied.  The Debtors reserve all rights to challenge the legal basis and amount of any asserted General Unsecured Claim, and each such Holder reserves all rights and defenses with respect to any such challenge. Notwithstanding anything in the Plan to the contrary, as additional consideration to Holders of Claims that vote in favor of the Plan, the Debtors and the Reorganized Debtors waive the right to pursue Avoidance Actions arising solely under section 547 of the Bankruptcy Code against such Holders only. | Impaired | Yes | 7.5% |
| 5 | Convenience Class Claims | Each Holder of a Convenience Class Claim shall receive in exchange for full and final satisfaction, settlement, release and discharge of each Convenience Class Claim, on the Effective Date, Cash in an amount equal to the lesser of the Allowed Amount of its Convenience Class Claim or $1,000 if such Holder of a Convenience Class is the Holder of a General Unsecured Claim and has elected to be treated as a Convenience Class Claim. | Unimpaired | No (Deemed to Accept) | 100% |
| 6 | Subordinated Claims | Holders of Subordinated Claims against the Debtors will not receive any distribution on account of such Claims and such Claims shall be discharged, cancelled, released and extinguished as of the | Unimpaired | No (Deemed to Reject) | 0% |

3

| | | Effective Date. | | | |
|---|---|---|---|---|---|
| 7 | Equity Interests in Insightra Medical, Inc. | Holders of Equity Interests in Insightra Medical, Inc. will not receive any distribution on account of such interests, and Equity Interests in Insightra Medical, Inc. shall be discharged, cancelled, released and extinguished as of the Effective Date. | Unimpaired | No (Deemed to Reject) | 0% |

## II.
## OVERVIEW OF DEBTORS' OPERATIONS

### A.    Debtors' Business.

Insightra Medical, Inc. ("***Insightra Medical***" or the "***Company***") is a commercial-stage cardiology and general surgery medical devices company focused on marketing and manufacturing Intra Aortic Balloon Catheter kits and niche surgical products for, among other things, the inguinal and ventral hernia markets based on its proprietary designs.  It was formed in 2001. Insightra Medical is headquartered in Irvine, California. The majority of its sales and marketing operations currently are based outside of the United States with a large part of operations based in India.  It is also party to a joint venture with German Medical Technology (Beijing) Co. Ltd. in China.

Insightra Medical is the parent corporation of Minos Medical, Inc. ("***Minos***"), a California corporation, Modulare, Inc. ("***Modulare***"), a Delaware corporation, Insightra Italia SRL ("***Insightra Italia***"), a company formed under the laws of Italy, and Insightra Medical India PVT Ltd. ("***Insightra India***"), a company formed under the laws of India. Minos, Insightra Italia and Insightra India are not Debtors in the Chapter 11 Cases.

Insightra Medical's core hernia products are Proflor and Octomesh.  Proflor is a novel polypropylene "biological spring" for inguinal hernia repair that, among other things, does not require sutures, reduces the procedure time and reduces opioid usage. Octomesh is a novel polypropylene ventral hernia repair system that, among other things, does not require sutures, lowers procedure failure and significantly reduces procedure time.   Both products are both 510(k) and CE Mark approved (the "***FDA Approvals***").  The FDA Approvals are an essential part of the Debtors' businesses and could be lost if this reorganization is unsuccessful.

Over the period of the twelve months ended on October 31, 2016, Insightra Medical had consolidated sales of $4,757,000 and a consolidated net loss of $10,791,000.  As of October 31, 2016, its assets had a net book value of $4,112,000 and it had total liabilities of $11,281,000.  Insightra Medical's main assets are inventory, patents and the FDA Approvals relating to its products.

### B.    Directors and Officers.

Insightra Medical currently has three directors:  Mr. Brad Sharp, Mr. Oliver Pokk, and Mr. Laxmikant Khanolkar.  Modulare currently has one director, Mr. Brad Sharp.

### C.    Regulation of Debtors' Business.

As stated above, the Debtors' products are regulated by the Federal Drug Administration.  The FDA Approvals are a necessary component of the Debtor's businesses and any disruption to the approvals would severely impact the Debtors' abilities to operate as a going concern.

### D.    Debtors' Capital Structure.

On November 4, 2015, Insightra Medical issued to GPB Life Science that certain 13% Senior Secured Promissory Note in the principal ("***Principal***") sum of $5,000,000 (the "***Promissory Note***").  The Promissory Note is fully secured by all of Insightra Medical's assets pursuant to that certain Security Agreement, dated November 4, 2015, by and among, Insightra Medical, Minos and Modulare.  The obligations are further guaranteed by Insightra India and Indical Medsurg PVT LTD pursuant to that certain Guaranty Agreement, dated November 4, 2015 (the "***Guaranty Agreement***" and together with the Promissory Note, Security Agreement and all related documents and amendments, the "***Loan Documents***").

Insightra Medical has failed to pay the monthly interest due and owing on the Promissory Note for the months of May, June, July, August, September, October, November and December 2016 and such failures constitute an Event of Default (the "***Specified Default***").  The aggregated amount due under the Promissory Note, including the default penalty,  unpaid accrued interest as of November 30, 2016 and expenses, is no less than approximately $6,292,113.

Insightra Medical's trade debt consists of approximately $2.6 million owing to approximately 60 vendors.

Insightra Medical is party to an unsecured Bridge Loan Agreement, entered into in April 2016, by and among Insightra Medical and various Equity Interest Holders, pursuant to which Insightra Medical issued to those Holders unsecured promissory notes in the aggregate principal amount of $1.5 million.

Insightra Medical has 5,683,443 shares of Series A Preferred Stock outstanding, 10,000,000 shares of Series B Preferred Stock outstanding, 44,885,424 shares of Series C Preferred Stock outstanding, and 33,352,593 shares of Series C-2 Preferred Stock outstanding.

Insightra Medical also has 18,264,271 shares of common outstanding.  Warrants to purchase 12,168,502 shares of common stock are outstanding.  Warrants to purchase

32,984,886 shares of Series C-2 Preferred Stock are outstanding and options to purchase 200,000 shares of common stock are also outstanding.

GPB Life Science holds a warrant to purchase 3,750,000 shares of common stock exercisable at $0.22 per share.  These warrants have not been exercised and have no value.

## III.
## KEY EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASE

In April 2013, Insightra Medical raised the first tranche of its Series C Preferred Stock financing with the express purpose of commercializing its core hernia assets in the US. The initial tranche of $13,000,000 did not provide sufficient funds for Insightra Medical to hire a direct US sales force.  At the time of the receipt of the second tranche of the Series C Preferred Stock financing in the amount of $6,000,000, it became clear to Insightra Medical that distribution and strategic partnerships were not viable options for Insightra Medical and the only option was to go to a direct US sales force.

Around the closing of the second tranche, Insightra Medical was approached by Baxter Healthcare Corporation ("*Baxter*") to distribute Baxter's Veritas product line; a product for biologic hernia repair.  The opportunity was projected to be a $10,000,000 business providing Insightra Medical with a fifty-percent (50%) commission.  The Company saw this opportunity as a way to offset the very significant cost of building a US sales force, and to accelerate the adoption of its core assets.  However, in August 2014, Baxter changed course and indicated that the base business was to be a thirty-percent (30%) commission.  This was ameliorated by the fact that Baxter indicated their intent to sell the global Veritas business before the end of 2014.

In October of 2014, the Veritas deal was signed calling for minimums of $7,500,000 in sales.  By the end of the first quarter of 2015, Insightra Medical had hired an additional 34 employees to support the Veritas business.

At the end of 2014, the Veritas business finished with approximately $7,100,000 in sales. However, Insightra Medical lost $1,200,000 of contracts during the year, which translated to a 2015 opening run rate of $5,800,000.  Baxter also announced at that time that it was no longer interested in selling Veritas, which ultimately led to negotiations between the parties concerning certain amendments to the distribution agreement.

In parallel, Insightra Medical's management pursued $12,000,000 to $15,000,000 of new long term debt, but given the Company's cash balance and the unavailability of insiders

to co-invest, the facility was difficult to obtain.  Insightra Medical retained a broker to assist in the debt raising process in March 2015.

In April 2015, Baxter again professed interest in selling the Veritas line.  Although the Veritas distribution agreement had not been amended, Baxter allowed the overdue payments from the Company to float to $1,000,000 as a showing of good faith.  However, in July of 2015, Baxter again changed its mind about selling the Veritas line and refused to amend the distribution agreement once again.  At the end of October 2015, Baxter indicated it needed more time since a new CEO was being hired, and in January of 2016 Baxter again declined to sell the Veritas line to the Company.  As a result, Insightra Medical suspended further payments to Baxter until Baxter revised the distribution agreement.  Baxter subsequently terminated the distribution agreement.

In April of 2015, Insightra Medical suffered from a liquidity crisis caused, in part, by the costs associated with its direct US sales force.  Management determined at that point that the company either had to sell its assets or pursue two identified strategic acquisitions.  Insightra Medical's board of directors authorized the pursuit of the acquisitions in parallel to closing on a secured debt facility.  Also, to aid in the liquidity crisis, certain of Insightra Medical's Equity Holders agreed to the $1,500,000 Bridge Loan Agreement.

In May of 2015, Insightra Medical entered into a non-binding term sheet for a new $16,000,000 secured debt facility.  However, closing never occurred and, in August 2015, Insightra Medical again ran out of cash.  At this point, Insightra Medical's broker introduced the Company to GPB.  By October 2015, the Company raised additional equity capital from insiders supplemented with the Promissory Note from GPB in the amount of $5,000,000.

With respect to the target acquisitions, Insighta Medical engaged Wedbush Securites ("*Wedbush*") to assist with the capital raising necessary to pursue to the transactions.  From October 2015 through May 2016,  Insightra Medical, with the assistance of Webdush, focused exclusively on raising capital.  Notwithstanding these efforts, the Company was unable to secure the funds it needed to pursue the transactions.  Given that insiders were not in a position to bridge the company further, the decision was taken by the board to eliminate all staff.

To make matters worse, on May 26, 2016, four of the five members of Insighta Medical's board of directors resigned.  These former directors are Michael Liang, Shane Johnson, Rajesh Moorti and Dan Omstead.

On October 27, 2016, pursuant to Insightra Medical's articles of incorporation, Chris Jarrous and Gayle Arnold, the Company's Chief Financial Officer, were appointed to Insightra Medical's board of directors.  On November 14, 2016, the Company's directors' and officers' insurance policy purportedly expired.  In the month of November, the Company was unable to obtain cost efficient insurance.  As a result, on December 15, 2016, Mr. Jarrous and Ms. Arnold resigned from the board of directors.

On December 16, 2016, Oliver Pokk and Laxmikant Khanolkar were appointed to the board of directors.  Both Messrs. Pokk and Khanolkar are former employees of Insightra Medical and currently work as consultants for the Company.  Because the Company was unable to obtain cost efficient insurance, Messrs. Pokk, Khanolkar and Sharp requested, and GPB agreed to provide, indemnification rights to each of them in an amount capped at $200,000 for actions taken from December 19, 2016 through the dismissal or the date that the Bankruptcy Court closes the Chapter 11 Cases.

As of the Petition Date, Insightra Medical has no employees.  Certain of the employees that were terminated were retained on a consulting basis, including Messrs. Pokk and Khanolkar.

Given these and other considerations, the Debtors have concluded in the exercise of their business judgment and as fiduciaries for all of the Debtors' stakeholders that the best and only viable path to maximize the value of their business is a strategic prepackaged chapter 11 filing to implement the Plan.

The Plan provides for a distribution to Holders of General Unsecured Claims who would not be entitled to any recovery outside of the Plan.

## IV.
## ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE

The Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in January 2017.  The filing of the petitions will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefit, and become subject to the limitations, of the Bankruptcy Code.  The Debtors intend to continue to operate their businesses in the ordinary course during the pendency of the Chapter 11 Cases as they had prior to the Petition Date.

### A.    Commencement of Chapter 11 Cases and First Day Motions

On the Petition Date, the Debtors intend to file various motions seeking relief from the Bankruptcy Court and requesting authority for the Debtors to maintain their operations

9

in the ordinary course.  Such relief is designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations.  The following is a brief overview of the relief the Debtors intend to seek on the Petition Date to maintain their operations in the ordinary course.

### 1.    Debtor In Possession Financing

The Debtors and GPB Life Science are in negotiations regarding debtor-in-possession financing.  The Debtors and GPB Life Science expect that the amount of debtor-in-possession financing required to fund this case will not exceed $750,000.  The Debtors will be filing a motion seeking approval of the debtor-in-possession financing package on the Petition Date.

### 2.    Cash Management System.

Insightra Medical operates through a small administrative office in Irvine, California, which maintains it corporate governance and accounting records.  Its inventories are primarily stored and shipped from company vendors in the US and in Dubai, Saudi Arabia.  Orders for product are placed and processed through the Irvine office and shipment requests are sent to these vendors ordering them to ship accordingly. Insightra Medical bills the customers and receives payments directly.  Orders for all new inventory are placed through Insightra Medical and supplied to its subsidiary as necessary.

Insightra Medical also operates in India through its Indian subsidiary, Insightra India. Insightra India sells the companies' products to customers within India.  Insightra India receives inventories from Insightra Medical and ships and bills direct to its customers. Payments for sales within India are collected by Insightra India and used to fund its operations.  Additional funds are sometimes sent from Insightra Medical to Insightra India to help subsidize its operations.  The Debtors will be filing a motion to continue maintaining its current cash management system.

### 3.    Bank Accounts.

Insightra Medical has one bank account at Comerica Bank.  The Debtors intend to file a motion to maintain this bank account during the Chapter 11 Cases.

### 4.    Protection of Net Operating Losses

The Debtors' net operating loss ("*NOL*") carryforwards and certain other tax attributes are valuable assets of the Debtors' estates.  The Debtors estimate that, as of the Petition

Date, they have incurred for U.S. federal income tax purposes, approximately $40 million of NOLs (subject to certain limitations) which may be a valuable asset of the Debtors. Section 382 of the U.S. Internal Revenue Code (the "**Tax Code**") limit's a corporation's ability to use its NOLs and certain other tax attributes after the corporation undergoes a proscribed change of ownership. However, the limitations imposed by section 382 of the Tax Code upon a change of ownership pursuant to a confirmed plan are significantly more relaxed than those otherwise applicable.

Accordingly, on the Petition Date, in order to protect the value of their NOL carryforwards and other tax attributes, the Debtors intend to seek an injunction from the Bankruptcy Court with the purpose of preserving the NOLs.

### B.    Other Procedural Motions and Retention of Professionals.

The Debtors intend to file various motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including an application to retain Bayard, P.A. to represent the Debtors in the Chapter 11 Cases.

### C.    Confirmation Hearing.

Contemporaneously with the filing of the Petition, the Debtors will seek an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider (i) the adequacy of the Disclosure Statement and the Solicitation in connection therewith and (ii) confirmation of the Plan. The Debtors anticipate that notice of these hearings will be published and mailed to all known Holders of Claims and Interests at least twenty eight (28) days before the date by which objections must be filed with the Bankruptcy Court.

### D.    Timetable for Chapter 11 Cases

The Debtors commenced soliciting votes for the Plan on or about December 20, 2016. The Voting Deadline is January 11, 2017. The Debtors expect to commence their Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in January 2017. The Debtors expect these Chapter 11 Cases to last between 60-75 days with an Effective Date of March 2017.

## V.
## PENDING LITIGATION

The Debtors are currently involved in one lawsuit filed by Giuseppe Amato ("**Amato**") on November 20, 2012 in the Superior Court of the State of California, Case No. BC495837 (the "**Amato Litigation**"). Amato, an inventor who entered into certain licensing and consulting agreements with Insightra Medical, filed a complaint alleging,

among other things, that he was fraudulently induced to enter into said agreements, and that as a result, the agreements should be rescinded and he should be entitled to recover unspecified damages.

The Debtors do not expect that they will have <u>any</u> liability as a result of the Amato Litigation, but recognize that there is risk inherent in any litigation. Insightra Medical intends to vigorously defend itself in the Amato Litigation, and believes that the claims brought by Amato therein are entirely without merit. Nonetheless, the Amato Litigation is not impacted by these cases, as the Reorganized Debtors intend to assume the license and consulting agreements and continue with the Litigation after the Effective Date.

## VI.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.

### A.    Administrative, DIP Facility and Priority Claims.

### 1.    Treatment of Administrative Claims.

As provided in Article II(A) of the Plan, subject to the provisions of sections 327, 330(a) and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and the Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, that, Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in Cash in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

### 2.    Treatment of DIP Facility Claims.

As provided in Article II(B) of the Plan, notwithstanding anything to the contrary therein, and subject to the terms of the DIP Facility, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all DIP Facility Claims, on the Effective Date, the DIP Facility Claims shall be converted into a portion of the New Secured Note and New Stock.

### 3.    Treatment of Priority Tax Claims.

As provided in Article II(C) of the Plan, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive on account of such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, regular installment payments in Cash over a period ending not later than five years after the Petition Date of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable non-bankruptcy law pursuant to section 511 of the Bankruptcy Code.  On the Effective Date, the Liens securing any Allowed Secured Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

### B.    Classification of Claims and Interests.

### 1.    Classification in General.

Pursuant to Article IV of the Plan, the Plan provides for the substantive consolidation of the Debtors' Estates into one Estate solely for Plan purposes, including voting, Confirmation and distributions.  A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; provided, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 2.    Summary of Classification of Claims and Interests.

Consistent with Article III of the Plan, the following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims  and Priority Tax Claims have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | GPB Secured Claim | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Convenience Class Claims | Unimpaired | Deemed to Accept |
| 6 | Subordinated Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests in Insightra Medical, Inc. | Impaired | Deemed to Reject |

The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or Interest is classified in a particular Class only to the extent that any such Claim or Interest is an Allowed Claim in that Class and has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

**C.    Treatments of Claims and Interests.**

**1.    Other Priority Claims – Class 1.**

Except to the extent that a Holder of an Other Priority Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Priority Claim, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on the later of the Effective Date or the date on which such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter;  provided, that, subject to Bankruptcy Court approval, priority wage claims may be paid in full in the ordinary course of business.

**2.    Other Secured Claims – Class 2.**

Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Secured Claim, each Holder of an Allowed Other Secured Claim, at the option of the Debtors, shall (i) be paid in full in Cash, (ii) receive the

collateral securing its Allowed Other Secured Claim, plus post-petition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

### 3.    GPB Secured Claim – Class 3.

In exchange for full and final satisfaction, settlement, release and discharge of no less than $4,800,000 of the GPB Secured Claim, on the Effective Date, GPB shall receive one hundred percent (100%) of the New Stock and the New Secured Note, each subject to dilution based upon satisfaction of the DIP Facility Claim.

The amount of the New Secured Note may be increased on or after the Effective Date for new money loaned to the Company by GPB based upon the Company's cash needs.

### 4.    General Unsecured Claims – Class 4.

If Class 4 votes to Accept the Plan, each Holder of an Allowed General Unsecured Claim shall receive in exchange for full and final satisfaction, settlement, release and discharge of each General Unsecured Claim, on or as soon as reasonably practicable after the Effective Date, seven and one-half percent (7.5%) of the Allowed General Unsecured Claim paid in Cash; provided however, that distributions on account of such Claims shall be made only to the extent such Claims were not previously satisfied.  The Debtors reserve all rights to challenge the legal basis and amount of any asserted General Unsecured Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.

Notwithstanding anything in the Plan to the contrary, as additional consideration to Holders of Claims that vote in favor of the Plan, the Debtors and the Reorganized Debtors waive the right to pursue Avoidance Actions arising solely under section 547 of the Bankruptcy Code against such entities only.

If Class 4 does not vote to Accept the Plan, Holders of Allowed General Unsecured Claims shall not receive any distributions under the Plan.

### 5.    Convenience Class Claims – Class 5.

Each Holder of a Convenience Class Claim shall receive in exchange for full and final satisfaction, settlement, release and discharge of each Convenience Class Claim, on the Effective Date, Cash in an amount equal to the lesser of the Allowed Amount of its

Convenience Class Claim or $1,000 if such Holder of a Convenience Class is the Holder of a General Unsecured Claim and has elected to be treated as a Convenience Class Claim.  The Debtors reserve all rights to challenge the legal basis and amount of any asserted Convenience Class Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.

### 6.    Subordinated Claims – Class 6.

Holders of Subordinated Claims against the Debtors will not receive any distribution on account of such Claims and such Claims shall be discharged, cancelled, released and extinguished as of the Effective Date.

### 7.    Equity Interests in Insightra Medical, Inc. – Class 7.

Holders of Equity Interests in Insightra Medical, Inc. will not receive any distribution on account of such interests, and Equity Interests in Insightra Medical, Inc. shall be discharged, cancelled, released and extinguished as of the Effective Date.

### D.    Means for Implementation.

### 1.    Corporate Existence.

Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as the Reorganized Debtors with all the powers of a corporation pursuant to the applicable laws of the State of California (in the case of Insightra Medical) or the State of Delaware (in the case of Modulare); provided, however, the Reorganized Debtors reserve the right to incorporate in new jurisdictions.

### 2.    Substantive Consolidation

The Plan provides for the substantive consolidation of the Debtors' Estates, but solely for purposes of the Plan, including voting on the Plan by Holders of Claims, making distributions to Holders of Claims in such Class under the Plan and Confirmation.  The Debtors reserve all rights with respect to the substantive consolidation of the Debtors.

### 3.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, the Confirmation Order or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in the Estates, all Debtors' Causes of Action, and any property acquired by  the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances.

### 4.    Cancellation of Agreements, Notes and Equity Interests

On the Effective Date, except to the extent otherwise provided, herein, all notes, stock, instruments, certificates, and other documents evidencing the GPB Secured Claim, Promissory Note, the Bridge Loan Agreement and Equity Interests in Insightra Medical, Inc. shall be cancelled and of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged.

### 5.    Reorganized Company Equity Interests

The equity interests of Reorganized Insightra Medical, Inc. shall consist of the New Stock.  On the Effective Date, Reorganized Insightra Medical, Inc. shall issue the New Stock pursuant to the terms of the Plan and the Amended and Restated Certificate of Incorporation, without need for any further corporate or shareholder action.

### 6.    Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan (the "*Restructuring Transactions*"), including, without limitation: (1) the merger of non-operating subsidiaries into Insightra Medical, Inc.; (2) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (3) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (4) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (5) all other actions that the Reorganized Debtors determine are necessary or appropriate.

### 7.    Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate, financing or related actions to be taken by or required of the Reorganized Debtors (including the Restructuring Transactions) shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further corporate or shareholder action.  Without limiting the foregoing,

such actions will include: (i) the merger of subsidiaries into Insightra Medical, Inc.; (ii) the adoption and (as applicable) filing of the Amended and Restated Certificate of Incorporation, and the Amended and Restated Bylaws; (iii) the appointment of officers and (as applicable) directors for the Reorganized Debtors; and (iv) the issuance of the New Stock, the New Secured Note and all related documents and instruments (as applicable), and all related documents and instruments (as applicable).

## 8.    Post-Effective Date Governance

The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.  Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Insightra Medical, Inc. shall be governed by the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws.

## 9.    Effectuating Documents and Further Transactions

Each of the Debtors and the Reorganized Debtors shall be authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements and/or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate and/or further evidence the terms and conditions of the Plan, any notes or securities issued pursuant to the Plan, and any transactions described in or contemplated by the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## 10.    Authority to Act

Prior to, on or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the shareholders, security holders, officers, directors, partners, managers, members or other owners of one or more of the Debtors or the Reorganized Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law, without any requirement of further vote, consent, approval, authorization or other action by such shareholders, security holders, officers, directors, partners, managers, members or other owners of such entities or notice to, order of, or hearing before, the Bankruptcy Court.

### 11. Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from the Debtors to the Reorganized Debtors or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, Securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, applicable Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12. Board Representation

The New Board shall consist of Kai Walter Trompeter, Tim Creutz, Chris Jarrous, and Evan Myrianthopoulus. Starting at such first annual meeting of shareholders, the board of directors of Reorganized Insightra Medical, Inc. shall be elected pursuant to the terms of the Amended and Restated Bylaws.

### 13. Senior Management

The senior management of the Reorganized Debtors shall be those persons designated in the Plan Supplement. The Reorganized Debtors' senior management shall serve in accordance with any employment agreement, policies or other arrangements as are acceptable to the Reorganized Debtors and applicable nonbankruptcy law.

### 14. Preservation of Rights of Action

Except for the actions released by the Debtors pursuant to Article IX.E of the Plan, and in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any

and all Debtors' Causes of Action, whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' right to commence, prosecute, or settle such Debtors' Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement or this Disclosure Statement to any Debtors' Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Debtors' Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Debtors' Causes of Action against any Person, except as otherwise expressly provided in the Plan.** Unless any Debtors' Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Debtors' Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Debtors' Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date. Further, except for the actions released by the Debtors pursuant to Article IX.E of the Plan, the Reorganized Debtors reserve and shall retain the foregoing Debtors' Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Debtors' Causes of Action that any Debtor may hold against any Person shall vest in the applicable Reorganized Debtor, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Debtors' Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Debtors' Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party. Notwithstanding anything in the Plan to the contrary, as additional consideration to Holders of Claims that vote in favor of the Plan, the Debtors waive the right to pursue Avoidance Actions arising solely under section 547 of the Bankruptcy Code against such Holders only.

### 15.    Nonconsensual Confirmation.

To the extent necessary, the Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code because Class 6 (Subordinated Claims) and Class 7 (Equity Interests in Insightra Medical, Inc.) are deemed to reject the Plan.

### 16.    Closing of Chapter 11 Cases.

After the Estates have been fully administered, the Reorganized Debtors shall promptly seek authority from the Bankruptcy Court to close the Chapter 11 Cases in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 17.    Notice of Effective Date.

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court and with the United States Securities and Exchange Commission.

### E.    Distributions.

### 1.    Distributions on Account of Claims and Equity Interests Allowed As of the Effective Date

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of Allowed Claims and Equity Interests on or before the Effective Date shall be made in accordance with Article II, Article III.B, Article IV and Article VI of the Plan;  provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice; provided, further, that the New Stock and New Secured Note to be issued under the Plan shall be deemed issued as of the Effective Date regardless of the date on which the New Stock and New Secured Note are actually dated, authenticated or distributed.

### 2.    Distributions on Account of Claims and Equity Interests Allowed After the Effective Date

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as reasonably practicable after the Disputed Claim becomes an Allowed Claim;  provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or

industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in accordance with Article II.C.

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order;  and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim (except to the extent such Allowed Claim is expressly Allowed pursuant to the Plan) unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed.

### 3.      Delivery of Distributions

On the Effective Date, the Claims Register shall be closed and the Distribution Agent shall be authorized to recognize only those record Holders listed on the Claims Register as of the close of business on the Effective Date.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly-traded certificate, is transferred twenty or fewer days before the Effective Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Reorganized Debtors reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

If any distribution to a Holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder as soon as reasonably practicable thereafter.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized

Debtors and shall not be supplemented with any interest, dividends or other accruals of any kind.

Any distribution under the Plan that is an Unclaimed Distribution for a period of six (6) months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors.

For a further description of the distribution process, see Article VI(C) of the Plan.

### 4.     No Postpetition Interest

Postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of any such Claim against the Debtors shall be entitled to payment or distributions on account of interest accruing on or after the Petition Date.

### 5.     Claims Paid or Payable by Third Parties

The Distribution Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the federal judgment rate in effect on the Petition Date on such amount owed for each Business Day after the two weeks grace period specified above until the amount is repaid.

### 6.     Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claim (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

### 7.    Minimum Distribution

Any other provision of the Plan notwithstanding, the Distribution Agent will not be required to make distributions of Cash less than $50 in value and each such Claim to which this limitation applies shall be discharged pursuant to Article IX.B, and its Holder forever barred pursuant to Article IX.I from asserting that Claim against the Reorganized Debtors or their property.

### 8.    General Unsecured Claims Distribution Account

On or as reasonably practicable after the Effective Date, the Debtors shall establish and fund the General Unsecured Claims Distribution Escrow Account, which shall be an escrow account separate and apart from the Debtors' general operating funds to be maintained in trust for the benefit of Holders of Allowed Class 4 General Unsecured Claims and funded in the estimated Allowed Amount of such Claims to the extent any such Claims remain unpaid as of the Effective Date. Cash held in the General Unsecured Claims Escrow Account shall not constitute property of the Debtors or the Reorganized Debtors. Distributions from the General Unsecured Claims Distribution Escrow Account to Holders of Allowed Class 4 General Unsecured Claims shall be made in accordance with the provisions governing distributions set forth in Article VI of the Plan. The General Unsecured Claims Distribution Escrow Account may be an interest-bearing account.

### F.    Procedures for Resolving Claims.

### 1.    Allowance of Claims and Equity Interests

Except as expressly provided in the Plan, or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim. Prior to and following the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

### 2.    Claims and Equity Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan, the Debtors, prior to the Effective Date, and the Reorganized Debtors, after the Effective Date, shall have the sole authority: (1) to File, withdraw or litigate to judgment, objections to Claims or Equity Interests; (2) to settle or compromise any Disputed Claim without any further notice to

or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

### 3.      Estimation of Claims and Equity Interests

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.

### 4.      Disallowance of Claims or Equity Interests

Any Claims or Equity Interests held by Entities from which property is recoverable under section 542, 543, 550 (other than in the case of a transfer avoidable solely pursuant to section 547 of the Bankruptcy Code), or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Equity Interests may not receive any distributions on account of such Claims and Equity Interests until such time as such Debtors' Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.

### 5.      Preservation of Debtor's Rights and Defenses Pending Allowance of Claims

Except as expressly provided herein or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim.  Except as expressly provided in the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors will have and shall retain after the Effective Date any and all rights and defenses that the Debtors had with respect to any Claim as of the Petition Date.  All Claims of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed disallowed as of the Effective Date

unless and until such Entity pays in full the amount that it owes the Debtors or Reorganized Debtors, as the case may be.

### G.   Executory Contracts and Unexpired Leases.

#### 1.   Assumption and Rejection of Executory Contracts and Unexpired Leases

Subject to the provisions of Article V of the Plan, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) is identified on the Rejected Executory Contract and Unexpired Lease Schedule, which such list shall be included in the Plan Supplement; (3) is the subject of a separate motion or notice to reject filed by the Debtors on or before the filing of the Rejected Executory Contracts and Unexpired Lease Schedule; or (4) is previously expired or terminated pursuant to its own terms.

For a further description of the treatment of Executory Contracts and Unexpired Leases, see Article V of the Plan.

#### 2.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any provisions or terms of the Debtors' Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by an agreed-upon waiver of Cure.  As part of the Plan Supplement, the Debtors shall File an Assumed Executory Contract and Unexpired Lease Schedule, which schedule shall identify the Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan and shall include any amounts of Cure to be paid in connection therewith.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served and actually received by the Debtors not later than seven (7) calendar days after the Plan Supplement Filing Date (with respect to the Assumed Executory Contract and Unexpired Lease Schedule).  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to have assented to, and will forever be barred from contesting, such assumption or Cure amount.  The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

3.     **Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise must be filed by Holders of such Claims with the Bankruptcy Court no later than thirty days after the later of (1) the effective date of rejection for such Holders to be entitled to receive distributions under the Plan on account of such Claims and (2) the Claims Bar Date.  Any Holder of a Rejection Damage Claim that does not timely File its Proof of Claim shall not (a) be treated as a creditor with respect to such Claim, or (b) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

4.     **Assumption of Directors and Officers Insurance Policies**

As of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired directors' and officers' liability insurance policies and fiduciary policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired directors' and officers' liability insurance policies and fiduciary policies.

5.     **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

6.     **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 7. Compensation and Benefits Programs

All of the Reorganized Debtors' employees were terminated prior to the Petition Date. As a result, the Reorganized Debtors currently have no employees.

As a result, subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed rejected on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

Notwithstanding anything to the contrary in Article V.G of the Plan or otherwise, the Reorganized Debtors' obligations, if any, to pay all "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) shall continue.

## H. Conditions Precedent to Confirmation of Plan and Effective Date.

### 1. Conditions Precedent to Confirmation.

It shall be a condition precedent to Confirmation of the Plan that the Plan, the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance satisfactory to the Debtors and GPB Life Science.

### 2. Conditions Precedent to the Effective Date.

The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with Article VIII.C of the Plan:

> (a) The Confirmation Order, in form and substance satisfactory to the Debtors shall have been entered in or about mid March of 2017 and shall be a Final Order;
>
> (b) The New Secured Note and related documents shall be finalized in form and substance satisfactory to GPB in its sole discretion;
>
> (c) GPB shall have provided the Company with a commitment to fund the Company's shortfalls for the following two year period;
>
> (d) The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are necessary to implement the Plan and required by law, regulation or order;

(e)  All actions, documents, certificates, and agreement necessary to implement the Plan shall have been effected and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws;

(f)  There shall have been no modification or stay of the Confirmation Order or entry of other court order prohibiting transactions contemplated by the Plan from being consummated;  and

(g)  The Effective Date shall have occurred on or prior to March 31, 2017.

### 3.  Waiver of Conditions Precedent.

Unless otherwise specified in the Plan, the conditions set forth in Articles VIII.A and VIII.B of the Plan may be waived, in whole or in part, by the Debtors with the consent of GPB in its sole discretion, without notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

### 4.  Non-Occurrence of Conditions.

If the conditions precedent specified in Article VIII.B. have not been satisfied or waived, the Debtors may determine, upon notice to the Bankruptcy Court, that the Plan is null and void in all respects, and nothing contained in the Plan, the Confirmation Order or the Disclosure Statement shall: (1) constitute a waiver or release of any Cause of Action or Claim by any party; (2) constitute an admission, acknowledgment, offer or undertaking in any respect by any party, including the Debtors; or (3) otherwise prejudice in any manner the rights of any party, including the Debtors.

### I.  Release, Injunctive and Related Provisions.

### 1.  Binding Effect; Plan Binds All Holders of Claims and Equity Interests.

On the Effective Date, and effective as of the Effective Date, the Plan shall, and shall be deemed to, be binding upon the Debtors and all present and former Holders of Claims against and Equity Interests in any Debtor, and their respective Related Persons, regardless of whether any such Holder of a Claim or Equity Interest has voted or failed to vote to accept or reject the Plan.

Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, the Debtors and any other necessary party, including without

limitation, the DIP Lender and GPB, shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to effect a transfer of property, a satisfaction of a Lien or a release of a Claim dealt with by the Plan and to perform any other act, including without limitation all documents set forth or contemplated in the Plan or Plan Supplement, that are necessary for the consummation of the Plan and the transactions contemplated herein.

### 2.    Discharge of Claims and Termination of Equity Interests

To the fullest extent provided under section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Equity Interests, and Causes of Action (other than Debtors' Causes of Action to the extent not released or waived pursuant to the Plan, which shall be preserved) of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action (other than Debtors' Causes of Action to the extent not released or waived pursuant to the Plan, which shall be preserved) that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### 3.    Subordination

The classification and manner of satisfying all Claims and Equity Interests under the Plan take into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code or otherwise.  All subordination rights that a Holder of a Claim or Equity Interest may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated and all actions related to the enforcement of

such subordination rights will be permanently enjoined. Accordingly, distributions pursuant to the Plan to Holders of Allowed Claims will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights; provided, however, that nothing contained herein shall preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered under or in connection with the Plan. For the avoidance of doubt, Subordinated Claims shall be disallowed and shall not be entitled to any distribution under the Plan.

4.    **Compromise and Settlement of Claims, Equity Interests, and Controversies**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, including, but not limited to, distributions to the Holders of the GPB Secured Claim and Allowed General Unsecured Claims, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable. After the Effective Date, the Reorganized Debtors may, and shall have the exclusive right to, compromise and settle any Claim against it and any Debtors' Causes of Action it may have against any other Person or Entity without notice to or approval from the Bankruptcy Court, including, without limitation, any and all derivative actions pending or otherwise existing against the Debtors as of the Effective Date.

5.    **Debtor Release**

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and any Person seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any of the Estates' representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to unconditionally and forever release, waive and discharge all Debtors' Causes of Action against each of the Released Parties in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11**

Cases, the Plan (other than the right of the Debtors to enforce the Plan and the contracts, releases, indentures, and other agreements or documents delivered thereunder) that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Plan, and that may be asserted by the Debtors in their individual capacity or on behalf (whether directly or derivatively) of the Debtors or their Estates, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; provided, however, that the foregoing shall not operate as a waiver or release from any Debtors' Causes of Action arising out of the acts or omissions constituting actual or intentional fraud, gross negligence, willful misconduct or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction.

Notwithstanding anything in the Plan to the contrary, as additional consideration to Holders of Claims that vote in favor of the Plan, the Debtors and the Reorganized Debtors waive the right to pursue Avoidance Actions arising solely under section 547 of the Bankruptcy Code against such Holders only.

###### 6.      Releases by Holders of Claims

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim against the Debtors that votes to accept the Plan and does not elect to opt out of this release and each Holder of a Claim against the Debtors that abstains from voting on the Plan and does not opt out of this release (each a "*Releasing Claimholder*") shall be deemed to unconditionally and forever release, waive, and discharge each of the Released Parties from any Causes of Action in connection with or related to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, the Plan (other than the rights of such Releasing Claimholder to enforce the Plan and the contracts, releases, indentures, and other agreements or documents delivered thereunder), that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date which could have been asserted by the Holders of Claims, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person; provided, however, that the foregoing shall not operate as a waiver or release from any Causes of Action arising out of the acts or omissions constituting actual or intentional fraud, gross negligence, willful misconduct or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction.

### 7.    Exculpation

**The Debtors and their Representatives shall not have or incur any liability to, or be subject to any right of action by, any Holder of any Claim against or an Equity Interest in the Debtors, or any other party in interest, or any of their respective Related Persons, for any act or omission in connection with, or arising out of, the Chapter 11 Cases and the Plan, the solicitation of acceptances of the Plan, the confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, the offer and issuance of any securities under the Plan, except for acts or omissions constituting actual or intentional fraud, gross negligence, willful misconduct or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction.**

### 8.    Injunction

**Except as otherwise provided in the Plan or in any document, instrument, release or other agreement entered into in connection with the Plan or approved by order of the Bankruptcy Court, the Confirmation Order shall provide, among other things, that from and after the Effective Date all Persons or Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors are (i) permanently enjoined from taking any of the following actions against the Estates, the Reorganized Debtors, the Released Parties (to the extent otherwise released under Article IX.F of the Plan)  or any of their respective property on account of any such Claims or Equity Interests and (ii) permanently enjoined from taking any of the following actions against any of the Debtors, the Reorganized Debtors, the Released Parties (to the extent otherwise released under Article IX.F of the Plan) or their respective property on account of such Claims or Equity Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; (D) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to the Debtors; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such Persons or Entities from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered under or in connection with the Plan.**

**By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have specifically consented to the injunctions set forth in Article IX.I of the Plan.**

### 9.    Setoffs

Except as otherwise provided in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim (other than DIP Facility Claim or GPB Secured Claim) or Equity Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Debtors' Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Debtors' Causes of Action against such Holder have not been otherwise compromised, waived or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Debtors' Causes of Action that such Reorganized Debtor may possess against such Holder.

### 10.    Release of Liens

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

### 11.    Solicitation of Plan.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and

solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 12.    Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the rejection of all employee compensation and Benefits Plans of the Debtors as provided in the Plan, (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the distribution of the New Stock, and (d) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to, any and all agreements, documents, securities, and instruments relating to the foregoing.

### J.    Retention of Jurisdiction.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising in, arising under and/or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by law.

### K.    Miscellaneous Provisions.

### 1.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Equity Interests (irrespective of whether Holders of such Claims or Equity Interests are deemed to have

accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan and any and all non-debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### 2.    Payment of Statutory Fees

The Debtors shall pay all United States Trustee quarterly fees under 28 U.S.C. section 1930(a), plus interest due and payable under 31 U.S.C. section 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' business, until the earliest of: (i) the entry of a final decree, (ii) dismissal of the Chapter 11 Cases, or (iii) conversion of the Chapter 11 Cases to chapter 7.

### 3.    Modification of Plan

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code.  After the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 4.    Revocation of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in the Debtors or any other Person or Entity, (ii) prejudice in any manner the rights of the Debtors or any other Person or Entity or (iii) constitute an admission of any sort by the Debtors or any other Person or Entity.

### 5.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

### 6.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

### 7.    Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtor shall be served on:

| The Debtors: | Counsel for the Debtors: |
|---|---|
| Insightra Medical, Inc.<br>9200 Irvine Center Drive, Suite 200<br>Irvine, California 92618<br>Attn: Gayle Arnold, CFO | Bayard, P.A.<br>Attn:  Justin R. Alberto, Esquire<br>        GianClaudio Finizio, Esquire<br>222 Delaware Avenue, Suite 900<br>Wilmington, Delaware 19801<br>Telephone: (302) 655-5000<br>Facsimile: (302) 658-6395<br>Email: jalberto@bayardlaw.com<br>        gfinizio@bayardlaw.com |
|  | **Counsel for GPB Capital Holdings, LLC:** |
|  | Sullivan & Worcester LLP<br>Attn:  Jeffrey R. Gleit, Esq.<br>1633 Broadway, 32nd Floor<br>New York, New York 10019<br>(212) 660-3000 |

### 8.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 9.    Entire Agreement

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 10.    Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

### 11.    Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.  After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or the Bankruptcy Court's website at www.deb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

### 12.    Nonseverability of Plan Provisions upon Confirmation

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the

maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified; and (3) nonseverable and mutually dependent.

### 13.    Closing of Chapter 11 Cases

The Reorganized Debtors shall promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

### 14.    Conflicts

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

### 15.    Section 1125(e) Good Faith Compliance

The Debtors, Reorganized Debtors and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### VII.
### FINANCIAL INFORMATION AND PROJECTIONS

### A.    Consolidated Condensed Projected Financial Information.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code (See Section XIII hereof), as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors prepared financial

projections (the "***Projections***") for the fiscal years 2016-2021 (the "***Projection Period***"), copies of which are attached hereto as Exhibit "B".

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Projections to Holders of Claims or other parties in interest after the Effective Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan. In connection with the planning and development of the Plan, the Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in demand for the Debtors' products, further competition within Debtors' current markets, changes in interest rates and inflation, changes in terms with material suppliers and/or a variety of other factors. Consequently, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The Projections included herein were last updated on October 27, 2016.

The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

THE DEBTORS PREPARED THESE PROJECTIONS IN CONNECTION WITH THEIR CHAPTER 11 CASES. THE DEBTORS DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE SEC. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING

THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS AND REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.  THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

The Projections assume that the Debtors will emerge from chapter 11 on or about March 1, 2017.

The Projections herein include pro forma consolidated statements of operations of the Debtors for fiscal years 2016-2021.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

# VIII.
# VALUATION ANALYSIS

Prior to the Petition Date, the Company retained Gavin/Solmonese LLC to determine a valuation of the Company's pre-confirmation assets as used in a going concern ("***Firm Value***") as of September 30, 2016 (the "***Valuation Date***").  Gavin/Solmonese LLC used best practice valuation approaches, including application of the income approach and market approach for its work.  Gavin/Solmonese LLC was unable to determine values using the cost approach as there was insufficient data available to conduct this analysis.

After reviewing projections prepared by the Company and other materials, Gavin/Solmonese LLC determined the Firm Value, as of the Valuation Date, ranged from $2.6 million to $4.0 million with a determined midpoint Firm Value of $3.3 million (the "***Valuation Analysis***").

As of the Valuation Date, the Company had total indebtedness of $11.4 million ("***Indebtedness***"), exceeding Firm Value for the same period by $7.5 million to $8.8 million and the midpoint Firm Value by $8.1 million.  Of this total indebtedness, $5.9 million was in the form of secured debt.

Upon review of the Company's balance sheet at the Valuation Date, and with an understanding of the Company's capital structure, Gavin/Solmonese determined that the Firm Value is less than the amount of pre-petition secured notes payable owed by the Company.  The balance sheet indicates that the company is insolvent, with liabilities exceeding its assets; the amount of only the secured debt liabilities also exceeds the total amount of its assets.  Accordingly, Gavin/Solmonese concludes that the Fair Value is insufficient to provide any recovery on claims by any unsecured creditors.

## IX.
## TRANSFER RESTRICTIONS AND CONSEQUENCES
## UNDER FEDERAL SECURITIES LAWS

Under the Plan, the New Stock will be issued to Holders of the Allowed GPB Secured Claim in reliance upon section 1145 of the Bankruptcy Code and/or Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act and state securities laws the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the New Stock issued to Holders of the Allowed GPB Secured Claim generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the Holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy

Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

To the extent that any securities under the Plan are issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.  Holders of restricted securities would, however, be permitted to resell New Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, or another applicable exemption from the securities laws, or if such securities are registered with the Securities and Exchange Commission.

In any case, recipients of new securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

**Listing.**  Upon the Effective Date of the Plan, the New Stock will not be publicly traded or listed on any national securities exchange.  Accordingly, no assurance can be given that a Holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

**Legends.**  To the extent certificated, certificates evidencing the New Stock will bear a legend substantially in the form below:

THE SHARES OF COMMON STOCK REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS REORGANIZED INSIGHTRA MEDICAL, INC. RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## X.
## CERTAIN TAX CONSEQUENCES OF PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to Holders of Secured Loan Claims.

This discussion does not address the U.S. federal income tax consequences to Holders of Claims or Interests who are unimpaired or deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Tax Code, Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("*IRS*"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax ("*AMT*") or the "Medicare" tax on unearned income, and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the New Stock in the secondary market.

This discussion assumes that the New Secured Note and the New Stock are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

The following summary of certain U.S. federal income tax consequences is for informational *purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. You are urged to consult your own tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan.*

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE SOLICITATIONS OF VOTES ON THE PLAN OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.    Consequences to the Debtors

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its attributes such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets by the amount of any cancellation of debt ("*COD*") incurred pursuant to a confirmed chapter 11 plan.  The amount of COD income incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor.  As a result, the approximately $40 million of NOLs held by the Debtors will be reduced by the COD that will take place on the Effective Date.  Thereafter, the Debtors will seek to preserve their remaining NOLs under IRC section 382(l)(5).

## B.    Consequences to GPB Life Science

GPB Life Science has represented to the Debtors that it will be seeking the advice of its tax advisors in connection with the tax consequences of the Plan on the treatment of the GPB Secured Claim.

C.     **Consequences to Holders of General Unsecured Claims and Convenience Class Claims**

Pursuant to the Plan, Holders of General Unsecured Claims (Class 4) will receive Cash distributions on the Effective Date at seven and one-half (7.5%) of the Allowed General Unsecured Claim.  Each Holder of a Convenience Class Claim shall receive in exchange Cash in an amount equal to the lesser of the Allowed Amount of its Convenience Class Claim or $1,000 if such Holder of a Convenience Class is the Holder of a General Unsecured Claim and has elected to be treated as a Convenience Class Claim.

D.     **Gain or Loss**

In general, a Holder of a General Unsecured Claim and a Convenience Class Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of Cash received by the Holder in respect of its Claim (other than any Claim for accrued but unpaid interest, and excluding any portion required to be treated as imputed interest due to the post-Effective Date distribution of such Cash) and (ii) the Holder's adjusted tax basis in its Claim (other than tax basis attributable to accrued but unpaid interest).

Because Distributions may be made to Holders after the Effective Date, any loss and a portion of any gain realized by such Holder may be deferred until such time as such Holder has received its Distribution.  All Holders of General Unsecured Claims and Convenience Class Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting any gain that may be recognized by such Holder in respect of its Claim.

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction.  A Holder of a General Unsecured Claim or a Convenience Class Claim that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the Tax Code.  Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### E.    Distributions in Satisfaction of Accrued but Unpaid Interest

In general, to the extent that any consideration received pursuant to the Plan by a Holder of a General Unsecured Claim or a Convenience Class Claim is received in satisfaction of interest accrued but unpaid during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income).  Conversely, a Holder generally recognizes a deductible loss to the extent that any accrued interest claimed was previously included in its gross income and is not paid in full.

Pursuant to the Plan, all distributions in respect of General Unsecured Claims and a Convenience Class Claim will be allocated first to the principal amount of such Claims, as determined for U.S. federal income tax purposes, and thereafter, to the portion of such Claim, if any, representing accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.  Each Holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

### F.    Information Reporting and Backup Withholding

All Distributions to Holders of Allowed Claims (including Allowed General Unsecured Claims and Convenience Class Claims) under the Plan are subject to any applicable withholding (including employment tax withholding).  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate.  Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("*TIN*"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these

regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holder's tax returns.

The foregoing summary has been provided for informational purposes only.  All Holders of Claims receiving a Distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local, and foreign tax consequences applicable under the Plan.

### G.   Consequences to Holders of Subordinated Claims

Pursuant to the Plan, Holders of Subordinated Claims, to the extent any exist, will not be receiving any distributions and should be entitled to take a loss to the extent that they currently have a tax basis for their Claim.  Holders of Subordinated Claims are urged to speak to their tax advisors prior to taking any such loss.

### H.   Consequences to Holders of Class 7 Equity Interests

Pursuant to the Plan, a Holder of Equity Interests in Insightra Medical will receive no distribution and its Equity Interests will be discharged, cancelled, released and extinguished as of the Effective Date.  Section 165(g) of the IRC permits a "worthless security deduction" for any security that is a capital asset that becomes worthless within the taxable year.  Thus, a Holder of Equity Interests may be entitled to a worthless security deduction.  The rules governing the timing and amount of worthless security deductions place considerable emphasis on the facts and circumstances of the Holder, the issuer, and the instrument with respect to which the deduction is claimed.  Holders are therefore urged to consult their tax advisors with respect to their ability to take such a deduction.

### I.   Accrued Interest

To the extent that any amount received by a Holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the Holder as ordinary interest income to the extent not already taken into income by the Holder.  Conversely, a Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which an amount received by a Holder of a Claim will be attributable to accrued interest on the debt instrument constituting the Claim is unclear.  Certain Treasury Regulations treat a payment under a debt instrument first as a payment of

accrued and unpaid interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the Plan, all distributions in respect of any Claim will be allocated first to the principal amount of such claim, to the extent otherwise permitted and as determined for U.S. federal income tax purposes, and thereafter to the remaining portion of such Claim, if any.

**XI.**

**CERTAIN RISK FACTORS TO BE CONSIDERED**

Prior to voting to accept or reject the Plan, Holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.

### A.    Certain Bankruptcy Law Considerations.

### 1.    General.

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key vendors, employees, and customers.  The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2.    Risk of Non-Confirmation of Plan.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all voting Classes voted in favor of the Plan or the requirements for "cramdown" are met with respect to

any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

### 3. Non-Consensual Confirmation.

In the event that any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

### 4. Risk of Non-Occurrence of Effective Date.

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article VIII of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 5. Conversion into Chapter 7 Cases.

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A chapter 7 case would result in the loss of the FDA Approvals.

### B. Additional Factors Affecting the Value of Reorganized Debtors.

### 1. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### C.    Risks Relating to the Debtors' Business and Financial Condition.

There are numerous risk factors that may effect the value of the Reorganized Debtors' New Stock. The Debtors and GPB have discussed these risk factors, which include, the FDA Approvals, U.S. laws, foreign operations, foreign laws, significant industry competition, changes in insurance regulations, ongoing and future litigation, and others.

### D.    Factors Relating to Securities to Be Issued Under the Plan, Generally.

#### 1.    No Current Public Market for Securities.

There is currently no market for the New Stock, and there can be no assurance as to the development or liquidity of any market for any such securities. The Reorganized Debtors are under no obligation to list any securities on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, Holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors. Accordingly, Holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

#### 2.    Potential Dilution.

The ownership percentage represented by the New Stock distributed on the Effective Date under the Plan will be subject to dilution from any other shares that may be issued post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the

New Stock issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

E.      **Risks Related to Outstanding Debt Obligations**

1.      **Insufficient Cash Flow to Meet Debt Obligations.**

On the Effective Date, on a consolidated basis, it is expected that the Reorganized Debtors will have total secured indebtedness of approximately up to $2,850,000 representing the New Secured Note.  This high level of expected indebtedness and the funds required to service such debt could, among other things, make it more difficult for the Reorganized Debtors to satisfy their obligations under such indebtedness, increasing the risk that they may default on such debt obligations.

The Reorganized Debtors' earnings and cash flow may vary significantly from year to year.  Additionally, the Reorganized Debtors' future cash flow may be insufficient to meet their debt obligations and commitments.  Any insufficiency could negatively impact the Reorganized Debtors' businesses.  A range of economic, competitive, business, and industry factors will affect the Reorganized Debtors' future financial performance and, as a result, their ability to generate cash flow from operations and to pay their debt.  Many of these factors are beyond the Reorganized Debtors' control.

If the Reorganized Debtors do not generate enough cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans, such as:

- Refinancing or restructuring debt;

- Selling assets;

- Reducing or delaying capital investments; or

- Seeking to raise additional capital.

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would allow the Reorganized Debtors to meet their debt obligations.  An inability to generate sufficient cash flow to satisfy their debt obligations or to obtain alternative financing could materially and adversely affect the Reorganized Debtors' ability to make payments on their debt obligations and their business, financial condition, results of operations, and prospects.

The amount of the New Secured Note may be increased on or after the Effective Date for new money loaned to the Company by GPB based upon the Company's cash needs.

### F.    Risks Related to an Investment in New Stock.

#### 1.    Equity Interests Subordinated to Reorganized Debtors' Indebtedness.

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Stock would rank below all debt claims against the Reorganized Debtors.  As a result, Holders of the New Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

#### 2.    Implied Valuation of New Stock Not Intended to Represent Trading Value of New Stock.

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (1) prevailing interest rates; (2) conditions in the financial markets; (3) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (4) other factors that generally influence the prices of securities.  The actual market price of the New Stock is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Stock to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Stock in the public or private markets.

### G.    Additional Factors

#### 1.    Debtors Could Withdraw Plan.

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

#### 2.    Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the

information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**3.     No Representations Outside this Disclosure Statement Are Authorized.**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

**4.     No Legal or Tax Advice Is Provided by this Disclosure Statement.**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Creditor or Equity Interest Holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Equity Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**5.     No Admission Made.**

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

**6.     Certain Tax Consequences.**

For a discussion of certain tax considerations to the Debtors and certain Holders of Claims in connection with the implementation of the Plan, see Article X hereof.

**XII.**
**VOTING PROCEDURES AND REQUIREMENTS**

**A.     Voting Instructions and Voting Deadline.**

Only Holders of the Class 3 Claim (GPB Secured Claim) and Class 4 Claims (General Unsecured Claims) (collectively, the "*Eligible Holders*") are entitled to vote to accept or reject the prepackaged Plan.  Alternatively, in lieu of voting on the Plan, any Holder of a

Class 4 General Unsecured Claim that is in excess of $1,000 may agree by an irrevocable written election to exchange its General Unsecured Claim for a Convenience Class Claim in the amount of $1,000.  All Class 4 ballots shall contain this option.

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a ballot (collectively, a "*Solicitation Package*") to record Holders of the Class 3 GPB Secured Claim and Class 4 General Unsecured Claims.

Each ballot contains detailed voting instructions.  Each ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating ballots.  The record date for determining which Holders are entitled to vote on the Plan is December 20, 2016.

Please complete the information requested on the ballot, sign, date and indicate your vote on the ballot, and return the completed ballot to DLS Claims Administration, LLC (the "*Voting Agent*") so it is received by them at the following address:

> Insightra - Modulare
> c/o DLS Claims Administration, LLC
> PO Box 2206
> Wilmington, Delaware 19899

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE DEBTORS' VOTING AGENT NO LATER THAN JANUARY 11, 2017, 5 P.M. EASTERN TIME (THE "*VOTING DEADLINE*").

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

If you are an Eligible Holder and you did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the procedures for voting on the prepackaged Plan, please contact counsel for the Debtors, Bayard, P.A., 222 Delaware Avenue, Suite 900, Wilmington, Delaware 19801, Attn: Justin Alberto, Esquire, Tel: (302) 655-5000, Fax: (302) 658-6395, E-mail: jalberto@bayardlaw.com.

### B.        Parties Entitled to Vote.

Pursuant to the provisions of the Bankruptcy Code, only Holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed plan are entitled to vote to accept or reject such proposed plan.  Classes of claims or equity interests in which the Holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted such plan and are not entitled to vote to accept or reject the plan.  For a detailed description of the treatment of Claims and equity Interests under the prepackaged Plan, see Section VI.C of this Disclosure Statement.

The Debtors will request confirmation of the prepackaged Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all Class 6 Subordinated Claims and Class 7 Equity Interests in Insightra Medical, Inc.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or equity interests.  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section VI.D(15) of this Disclosure Statement.

Claims in Class 3 (the GPB Secured Claim) and Class 4 (General Unsecured Claims) of the prepackaged Plan are impaired and Eligible Holders in such Classes will receive distributions under the prepackaged Plan.  As a result, Eligible Holders are entitled to vote to accept or reject the prepackaged Plan.  Claims in all other Classes are either unimpaired and deemed to accept or impaired and deemed to reject the Plan and are not entitled to vote.

Claims in Class 5 (Convenience Class Claims) are unimpaired and are deemed to accept the Plan under section 1126(f).

### C.        Agreements Upon Furnishing Ballots.

The delivery of an accepting ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) *the terms of the prepackaged Plan including the injunction, releases, and exculpations set forth in Article IX therein*.  All parties in interest retain their right to object to confirmation of the prepackaged Plan.

### D.    Change of Vote.

Except as provided in the Restructuring Support Agreement, any party who has previously submitted to the Debtors' Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Debtors' Voting Agent prior to the Voting Deadline a subsequent, properly completed ballot for acceptance or rejection of the prepackaged Plan.

### E.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Debtors, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular ballot by any of their creditors. The interpretation (including the ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### F.    Miscellaneous.

Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated, and timely received, but on which a vote to accept or reject the prepackaged Plan has not been indicated, will not be counted. The Debtors' Voting Agent, in its sole discretion, may attempt to contact such voters to cure any such defects in the ballots. If you return more than one ballot voting different Claims, the ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those ballots will not be counted. An otherwise properly executed ballot that attempts to partially accept and partially reject the prepackaged Plan will likewise not be counted.

The ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Debtors' Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the anticipated Petition Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Holders of the GPB Secured Claim and Holders of the General Secured Claims, as applicable, who actually vote will be counted.  The failure of a Holder to deliver a duly executed ballot to the Debtors' Voting Agent will be deemed to constitute an abstention by such Holder with respect to voting on the prepackaged Plan and such abstentions will not be counted as votes for or against the prepackaged Plan.

Except as provided below, unless the ballot is timely submitted to the Debtors' Voting Agent before the Voting Deadline together with any other documents required by such ballot, the Debtors' Voting Agent may, in its sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the prepackaged Plan.

## XIII.
## CONFIRMATION OF PLAN

### A.    Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  On, or as promptly as practicable after, the Solicitation Period, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B.    Objections to Confirmation.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the

name of the objector, the nature and amount of Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

    (a)  *The Debtors* at:
        Insightra Medical, Inc.
        9200 Irvine Center Drive, Suite 200
        Irvine, California 92618
        Attn: Gayle Arnold, CFO

        And

        *Counsel for the Debtors* at:
        Bayard, P.A.
        Attn: Justin R. Alberto and GianClaudio Finizio
        222 Delaware Avenue, Suite 900
        Wilmington, Delaware 19801
        Telephone: (302) 655-5000
        Facsimile: (302) 658-6395
        Email: jalberto@bayardlaw.com
              gfinizio@bayardlaw.com

    (b)  *Office of the U.S. Trustee* at:
        Office of the U.S. Trustee for Region 3
        844 King Street
        Suite 2207
        Lockbox 35
        Wilmington, DE 19801

    (c)  *Counsel for GPB Life Science Holdings, LLC* at:
        Sullivan & Worcester LLP
        1633 Broadway
        New York, NY 10019
        Attn: Jeffrey R. Gleit, Esq.
           Nathaniel R.B. Koslof, Esq

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

C.     **Requirements for Confirmation of Plan.**

1.     **Requirements of Section 1129(a) of the Bankruptcy Code.**

(a)   General Requirements.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)   the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)  the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)   any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests Holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

61

(vi) with respect to each Class of Claims or Interests, each Holder of an impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii) except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii) except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix) at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class; confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(x) all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b) Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such Holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such Holder would receive or retain if the debtors were

liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the Holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtors' assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all Holders of impaired Claims and Interests will receive property with a value not less than the value such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of impaired Claims and Interests, (ii) the fact that the Debtors would lose the FDA Approvals in a chapter 7 case, and (3) the Valuation Analysis.  The FDA Approvals cannot be transferred as part of a sale.

(c)   Feasibility

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Projections discussed in Article VII and attached as Exhibit B hereto.  Based upon such Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Moreover, Article XI hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(d)   Equitable Distribution of Voting Power

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors shall be amended as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision

setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

### 2.   Additional Requirements for Non-Consensual Confirmation.

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, Holders of Claims in Class 6 and Interests in Class 7 will not receive a distribution and are thereby deemed to reject the Plan. However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

### (a)   Unfair Discrimination Test

The "no unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

### (b)   Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

(i)    Secured Creditors

The Bankruptcy Code provides that each Holder of an impaired secured claim either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receives the "indubitable equivalent" of its allowed secured claim.  The Plan provides that the Holder of the Class 3 GPB Secured Claim shall receive one hundred percent (100%) of the New Stock and the New Secured Note subject to dilution based upon the satisfaction of the DIP Facility Claims.

(ii)    Unsecured Creditors

The Bankruptcy Code provides that either (i) each Holder of an impaired unsecured claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim or (ii) the Holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization.  The Plan provides that all Holders of General Unsecured Claims in Class 4 shall receive seven and one-half (7.5%) of the Allowed General Unsecured Claim paid in Cash on the Effective Date.  As no Holders of claims and equity interests that are junior to the Class 4 General Unsecured Claims will receive any property under the Plan, the Plan meets the "fair and equitable" test with respect to unsecured Claims.

(iii)    Equity Interests

With respect to a class of equity interests, either (i) each Holder of an equity interest will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the Holders of equity interests that are junior to any dissenting class of equity interests will not receive any property under the plan of reorganization.  Pursuant to the Plan, no Holders of an Equity Interest in Insightra Medical will receive a distribution on account of such Interests.  Accordingly, the Plan meets the "fair and equitable" test with respect to those Interests.

**XIV.**
**ALTERNATIVES TO CONFIRMATION AND**
**CONSUMMATION OF THE PLAN**

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will

maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.      Alternative Plan of Reorganization.

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets. The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.      Sale Under Section 363 of the Bankruptcy Code.

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. The Holders of the Class 3 GPB Secured Claim would be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by GPB Life Science would attach to the proceeds of any sale of the Debtors' assets. After this Claim is satisfied, the remaining funds could be used to pay Holders of Claims in Class 4. Upon analysis and consideration of this alternative, the Debtors do not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for Holders of Claims than the Plan. Because the FDA Approvals cannot be transferred as part of a Plan, a sale of the Debtors' assets is not feasible.

### C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law.

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the loss of the Debtors' FDA Approvals, delay resulting from the conversion of the cases, and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be

required to become familiar with the many legal and factual issues in the Debtors'
Chapter 11 Cases.

## XV.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the
Holders of the GPB Secured Claim in Class 3 and Holders of General Unsecured Claims
in Class 4 to vote in favor thereof.

Dated: December 20, 2016

Respectfully submitted,

**INSIGHTRA MEDICAL, INC.**

By: ___/s/ Oliver Pokk_____
             Name: Oliver Pokk
             Title: Member of the Board of Directors

**MODULARE, INC.**

By: ___/s/ Brad Sharp_____
             Name: Brad Sharp
             Title: Member of the Board of Directors

Exhibit A

Prepackaged Plan

Exhibit B

Projections

**Insightra Medical**
Consolidated Quarterly and Annual Statements of Income

### Year 1 – Year 3

| | Q1 | Q2 | Q3 | Q4 | Year 1 | | Q1 | Q2 | Q3 | Q4 | Year 2 | | Q1 | Q2 | Q3 | Q4 | Year 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue - Net** | *349* | *393* | *397* | *467* | *1,606* | | *479* | *511* | *629* | *661* | *2,280* | | *869* | *869* | *869* | *869* | *3,476* |
| IAB Ultra | 279 | 307 | 327 | 381 | 1,294 | [18%] | 381 | 381 | 381 | 381 | 1,524 | [25%] | 476 | 476 | 476 | 476 | 1,905 |
| Hernia | 70 | 86 | 70 | 86 | 312 | [46%] | 98 | 130 | 98 | 130 | 456 | [80%] | 205 | 205 | 205 | 205 | 821 |
| Modulare | - | - | - | - | - | [0%] | - | - | 150 | 150 | 300 | [150%] | 188 | 188 | 188 | 188 | 750 |
| | | | | | | | | | | | | | | | | | |
| **Gross Margin** | *192* | *208* | *208* | *232* | *840* | | *253* | *276* | *388* | *411* | *1,329* | | *535* | *535* | *535* | *535* | *2,142* |
| IAB Ultra | 148 | 157 | 164 | 181 | 651 | [48%] | 181 | 181 | 181 | 181 | 725 | [49%] | 233 | 233 | 233 | 233 | 933 |
| Hernia | 44 | 51 | 44 | 51 | 190 | [73%] | 72 | 95 | 72 | 95 | 334 | [61%] | 133 | 133 | 133 | 133 | 534 |
| Modulare | - | - | - | - | - | [0%] | - | - | 135 | 135 | 270 | [90%] | 169 | 169 | 169 | 169 | 675 |
| | 55% | 53% | 52% | 50% | 52% | | 53% | 54% | 62% | 62% | 58% | | 62% | 62% | 62% | 62% | 62% |
| | | | | | | | | | | | | | | | | | |
| **SG&A Total** | **649** | **700** | **700** | **649** | **2,698** | | **665** | **665** | **665** | **664** | **2,659** | | **692** | **692** | **692** | **692** | **2,770** |
| Sales and Marketing | 300 | 300 | 300 | 300 | 1,200 | [4%] | 311 | 311 | 311 | 311 | 1,245 | [8%] | 336 | 336 | 336 | 336 | 1,345 |
| Research & Development | 74 | 74 | 74 | 74 | 294 | [1%] | 75 | 75 | 75 | 75 | 298 | [0%] | 75 | 75 | 75 | 75 | 298 |
| General and Administration | 276 | 327 | 326 | 275 | 1,204 | [-7%] | 279 | 279 | 279 | 279 | 1,116 | [1%] | 282 | 282 | 282 | 282 | 1,127 |
| *SG&A as % Sales* | *186%* | *178%* | *176%* | *139%* | *168%* | | *139%* | *130%* | *106%* | *101%* | *117%* | | *80%* | *80%* | *80%* | *80%* | *80%* |
| | | | | | | | | | | | | | | | | | |
| **EBITDA** | (457) | (492) | (492) | (416) | (1,858) | | (412) | (389) | (277) | (253) | (1,330) | | (157) | (157) | (157) | (157) | (628) |
| *EBITDA as % Sales* | *-131%* | *-125%* | *-124%* | *-89%* | *-116%* | | *-86%* | *-76%* | *-44%* | *-38%* | *-58%* | | *-18%* | *-18%* | *-18%* | *-18%* | *-18%* |

### Year 4 – Year 5

| | | Q1 | Q2 | Q3 | Q4 | Year 4 | | Q1 | Q2 | Q3 | Q4 | Year 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue - Net** | | *1,046* | *1,046* | *1,046* | *1,046* | *4,298* | | *1,296* | *1,296* | *1,296* | *1,296* | *5,183* |
| IAB Ultra | [20%] | 572 | 572 | 572 | 572 | 2,286 | [18%] | 674 | 674 | 674 | 674 | 2,697 |
| Hernia | [40%] | 287 | 287 | 287 | 287 | 1,149 | [30%] | 373 | 373 | 373 | 373 | 1,494 |
| Modulare | [15%] | 188 | 188 | 188 | 188 | 863 | [15%] | 248 | 248 | 248 | 248 | 992 |
| | | | | | | | | | | | | |
| **Gross Margin** | | *656* | *656* | *656* | *656* | *2,622* | | *835* | *835* | *835* | *835* | *3,341* |
| IAB Ultra | [50%] | 286 | 286 | 286 | 286 | 1,143 | [52%] | 351 | 351 | 351 | 351 | 1,403 |
| Hernia | [70%] | 201 | 201 | 201 | 201 | 804 | [70%] | 261 | 261 | 261 | 261 | 1,046 |
| Modulare | [90%] | 169 | 169 | 169 | 169 | 675 | [90%] | 223 | 223 | 223 | 223 | 893 |
| | | 63% | 63% | 63% | 63% | 61% | | 64% | 64% | 64% | 64% | 64% |
| | | | | | | | | | | | | |
| **SG&A Total** | | **722** | **722** | **722** | **722** | **2,887** | | **761** | **761** | **761** | **761** | **3,045** |
| Sales and Marketing | [7%] | 360 | 360 | 360 | 360 | 1,439 | [9%] | 392 | 392 | 392 | 392 | 1,568 |
| Research & Development | [0%] | 75 | 75 | 75 | 75 | 298 | [2%] | 76 | 76 | 76 | 76 | 304 |
| General and Administration | [2%] | 287 | 287 | 287 | 287 | 1,149 | [2%] | 293 | 293 | 293 | 293 | 1,172 |
| *SG&A as % Sales* | | *69%* | *69%* | *69%* | *69%* | *67%* | | *59%* | *59%* | *59%* | *59%* | *59%* |
| | | | | | | | | | | | | |
| **EBITDA** | | (66) | (66) | (66) | (66) | (264) | | 74 | 74 | 74 | 74 | 296 |
| *EBITDA as % Sales* | | *-6%* | *-6%* | *-6%* | *-6%* | *-6%* | | *6%* | *6%* | *6%* | *6%* | *6%* |